114 S.W.3d 641 (2003)
In the Interest of B.L.M. and J.L.M., Jr., Children.
No. 2-02-377-CV.
Court of Appeals of Texas, Fort Worth.
July 24, 2003.
*642 Jas. Bruce Harris, Wichita Falls, for appellant.
Locke Liddell & Sapp, L.L.P., W. Scott Hastings, Dallas, for appellee.
PANEL F: DAY, LIVINGSTON, and WALKER, JJ.

OPINION
SUE WALKER, Justice.

I. Introduction
Following a bench trial, the trial court found that Appellant J.M.'s parent-child relationship with his daughter, B.L.M., and son, J.L.M., should be terminated and entered judgment accordingly. In six issues, J.M. complains that the evidence is factually insufficient to support the statutory grounds relied upon by the trial court to terminate his parental rights and that the Texas Department of Protective and Regulatory Services ("TDPRS") violated the Americans With Disabilities Act ("ADA") in the course of its treatment of him. We will affirm.

II. FACTUAL AND PROCEDURAL HISTORY
J.M. is the father of B.L.M., born in December 1993, and J.L.M., born in November 1995 (the "Children"). From approximately 1994 to 1996, J.M. resided in California with, A.M., the mother of the Children, B.L.M. and, after his birth, J.L.M. The family lived in a number of locations and relied on welfare as a means of support. J.M. testified, and A.M. confirmed, that during this time A.M. used drugs, including methamphetamine. J.M. also used narcotics with A.M. before he "committed [himself] to the church." Additionally, there was some evidence of domestic violence between J.M. and A.M. around this time. In 1996, A.M. took the Children and moved to Wichita Falls, Texas. At the time of the move, B.L.M. was two years of age and J.L.M. was just six months old. J.M. remained in California and did not have any personal contact with the Children until the summer of 2000 when A.M. and the Children visited him in California. In October 2000, TDPRS removed the Children from A.M.'s home based on her alleged neglectful supervision of the Children and continued narcotics use. TDPRS implemented a service plan for A.M. with the goal of returning the Children to her. A.M., however, tested positive for narcotics in multiple drug screenings. TDPRS determined that A.M.'s drug-use was not improving. A.M. voluntarily relinquished her parental rights to the Children in April 2002.
J.M. contacted TDPRS for the first time in December 2000, two months after the Children had been removed from their mother's home. Between December 2000 and May 2001, J.M. contacted TDPRS three or four times, and between May 2001 and May 2002, TDPRS heard from J.M. only twice. J.M. contacted the Children a number of times while they were in foster care. Prior to the Children's placement in foster case, J.M. sent the Children Christmas presents one year, and sent money to V.A., A.M.'s mother, on at least one occasion. Excluding these gestures, J.M. provided no support for the Children before or after A.M. voluntarily relinquished her parental rights.
After A.M. and the Children moved to Wichita Falls, J.M.'s financial status did not improve. J.M. testified that he has *643 had between fifteen and twenty jobs over the last five years. He has been out of work for more than a month at a time during the last year and one-half. J.M. resided in a number of different locations during this time, including his brother's residence and a barn.
J.M.'s parental rights were terminated in April 2002 after a default judgment was rendered against him for failing to appear for trial. After learning that his parental rights had been terminated, J.M. filed a motion for a new trial asserting that he had been involuntarily committed in a mental institution in California from February 2002 to April 2002 and had therefore not received proper notice of the termination suit. The trial court agreed and granted J.M. a new trial.
J.M. moved to Wichita Falls in May 2002. Following J.M.'s arrival in Wichita Falls, TDPRS began working with J.M. to evaluate and improve his parenting skills. J.M. met with Marilyn Morgan ("Morgan"), a parent worker with TDPRS, in June 2002 and was informed of the various services TDPRS wished to provide. These included, among other things, a psychological evaluation, counseling, and parenting classes. J.M. initially declined TDPRS's services, but later agreed to participate in the suggested programs. J.M. nonetheless would not complete two out of three portions of the psychological evaluation; he did not attend the scheduled individual counseling sessions; he refused to sign the release of information form to permit TDPRS to obtain his mental health records; and, he attended only two parenting classes.
TDPRS permitted J.M. to contact the Children through supervised telephone calls. The Children seemed "excited" to hear from their father during the first phone conversation. In subsequent telephone conversations, J.M. and the Children discussed how the Children were doing and their experiences at Vacation Bible School. During parts of the conversations, however, J.M. responded to the Children's remarks with long, complicated answers that the Children had difficulty understanding. Morgan testified that, as J.M.'s phone visits with the Children progressed, J.M. repeatedly discussed the supernatural and supernatural things he had experienced. Morgan also testified that the Children appeared to become bored during the conversations, would ask whether the conversation was almost over, and would often comment that they did not understand what J.M. was talking about. Furthermore, Morgan said that the Children's foster parents reported that the Children had a tendency to engage in "disruptive behavior for a day or two after each phone visit."
TDPRS learned that J.M. is a noncompliant paranoid schizophrenic who suffers from delusional thought and loosening of associations. TDPRS filed a second petition to terminate J.M.'s parental rights to the Children based upon his noncompliance with TDPRS's service plan, his inability to care for the Children based on his mental illness, and six other grounds. Following a bench trial, the trial court found that five of the termination grounds pleaded by TDPRS were supported by clear and convincing evidence justifying termination of J.M.'s parental rights. The trial court entered an order terminating J.M.'s parental rights to the Children, and this appeal followed.

III. BURDEN OF PROOF IN TERMINATION PROCEEDINGS
A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." Santosky v. Kramer, 455 U.S. 745, *644 758-59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982); accord Holick v. Smith, 685 S.W.2d 18, 20 (Tex.1985). The United States Supreme Court, in discussing the constitutional stature of parental rights, states, "[T]he interest of parents in the care, custody, and control of their childrenis perhaps the oldest of the fundamental liberty interests recognized by this Court." Troxel v. Granville, 530 U.S. 57, 65, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000). Nonetheless, while parental rights are of constitutional magnitude, they are not absolute. In re C.H., 89 S.W.3d 17, 26 (Tex.2002). Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right. Id.
In proceedings to terminate the parent-chid relationship brought under section 161.001 of the family code, TDPRS must establish one or more of the acts or omissions enumerated under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam.Code Ann. § 161.001 (Vernon 2002); Swate v. Swate, 72 S.W.3d 763, 766 (Tex.App.-Waco 2002, pet. denied). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. Tex. Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex.1987). Because of the elevated status of parental rights, the quantum of proof required in a termination proceeding is elevated from the preponderance of the evidence to clear and convincing evidence. Santosky, 455 U.S. at 746, 102 S.Ct. at 1391; see also Tex. Fam.Code Ann. § 161.001.
Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam.Code Ann. § 101.007; In re J.F.C., 96 S.W.3d 256, 264 (Tex.2002); In re C.H., 89 S.W.3d at 25. This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard in criminal proceedings. State v. Addington, 588 S.W.2d 569, 570 (Tex.1979); In re D.T., 34 S.W.3d 625, 630 (Tex.App.-Fort Worth 2001, pet. denied) (op. on reh'g). While the proof must be more than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed. Addington, 588 S.W.2d at 570. Termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent. Holick, 685 S.W.2d at 20-21; In re A.V., 849 S.W.2d 393, 400 (Tex.App.-Fort Worth 1993, no writ).

IV. FACTUAL SUFFICIENCY OF THE EVIDENCE
J.M. complains that the evidence is factually insufficient to support any of the five statutory termination grounds found by the trial court. J.M. does not contest the trial court's finding that termination of the parent-child relationship is in the best interests of the Children. Therefore, we examine only the first prong of the parent-child relationship termination inquiry.

A. Standard of Review
The higher burden of proof in termination cases alters the appellate standard of factual sufficiency review. In re C.H., 89 S.W.3d at 25. "[A] finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance." Id. In considering whether the evidence of termination rises to the level of being clear and convincing, *645 we must determine "whether the evidence is such that a fact finder could reasonably form a firm belief or conviction" that the grounds for termination were proven. Id. Our inquiry here is whether, on the entire record, a fact finder could reasonably form a firm conviction or belief that the parent violated at least one of the provisions deemed found in support of the trial court's judgment. See Tex. Fam.Code Ann. §§ 161.001(1), 161.003; In re C.H., 89 S.W.3d at 28.
B. Trial Court's Grounds for Termination
The trial court found that J.M. (1) knowingly placed or knowingly allowed the Children to remain in conditions or surroundings which endangered their physical or emotional well-being; (2) voluntarily left the Children alone or in the possession of another without providing adequate support of the Children and remained away for a period of at least six months; (3) failed to support the Children in accordance with his ability during a period of one year ending within six months of the date of the filing of the petition; (4) failed to comply with the provisions of a court order that specifically established the actions necessary for the father to obtain the return of the Children who have been in the permanent or temporary managing conservatorship of TDPRS for no less than nine months; and (5) has a mental or emotional illness or mental deficiency that renders him unable to care for the Children. See Tex. Fam.Code Ann. §§ 161.001(1)(D), (C), (F), (O), 161.003.
C. Mental Illness Rendering J.M. Unable to Care for Children
In his fifth issue, J.M. contends that the evidence is factually insufficient to support the trial court's finding that he has a mental or emotional illness or mental deficiency that renders him unable to care for the Children. See id. § 161.003. Termination of the parent-child relationship is permitted under section 161.003(a) if the court finds: (1) the parent has a mental or emotional illness or a mental deficiency that renders the parent unable to provide for the physical, emotional, and mental needs of the child; (2) the illness or deficiency, in all reasonable probability, proved by clear and convincing evidence, will continue to render the parent unable to provide for the child's needs until the eighteenth birthday of the child; (3) the department has been the temporary or sole managing conservator of the child of the parent for at least six months preceding the date of the hearing on the termination; (4) the department has made reasonable efforts to return the child to the parent; and (5) the termination is in the best interest of the child. Id. § 161.003(a). J.M. does not challenge the sufficiency of the evidence to establish subsections (1), (3), (4), and (5). He limits his factual sufficiency challenge to the evidence supporting subsection (2): that his illness in all reasonable probability will continue to render him unable to provide for the Children's needs until their eighteenth birthdays.
J.M. contends that none of the witnesses testified with certainty that his mental illness would continue to render him unable to provide for the Children's needs until they reached the age of eighteen. The record contains the following evidence concerning the continuing nature of J.M.'s mental illness.
J.M. testified at trial and denied that he suffers from paranoid schizophrenia, said he does not hear voices, affirmatively stated that he does not presently take medication, and probably most significant of all, exhibited an intent to never take medication in the future. J.M. testified that in *646 the past taking medication hurt him instead of helping him. J.M. testified:
I was on Zyprexa for approximately a year, I think it was, a year and a half maybe. Long enough to know that they had placed the veil upon my spiritual mind, and I think it stops it, shuts down the nerve, it puts a veil over your mind and closes it off and keeps the neurons from firing, and the expansions of those neurons from actually making the sparks to keep your brain from generating. I wouldn't call it electromagnetic fields, but the way it actually generates the creativity of your mind.
J.M. exhibited signs of his paranoid schizophrenia throughout his testimony. He mentioned, "The gentlemen who picked me up while I was in California ... represented themselves as officers of the law, which I'm sure they are, but they were probably Navy Seals dressed as an officer of the law...." J.M. was also convinced that "[t]he government has probably well watched over me" and that "[t]he President probably thinks highly of me...."
J.M. testified that he could take care of the Children. He admitted that he had, and would have in the future, very limited financial resources. At the time of the trial, J.M. was currently employed and was working five days a week, eight hours a day. J.M. said that he did not want to have his parental rights terminated, that he wanted to continue to have a relationship with the Children, and that he loves the Children.
Dr. David Sabine ("Dr. Sabine") performed a psychological evaluation on J.M. at CPS's request. Dr. Sabine testified that J.M. suffered from paranoid schizophrenia and that schizophrenia is a "prolonged illness," a lifetime disease.[1] Dr. Sabine explained:
The process of paranoid schizophrenia is a dementing process, and it affects the brain and is not simply an emotional disorder. There is a disruption in the neural pathways of that person. The ventricles in the brain, which are the spaces in the brain, are normally filled with fluid and enlarged, because the brain is shrinking over time. And at this time there is no effective cure for schizophrenia, and it is a progressive illness.
Consistent treatment and medication is essential to stabilize the effects of the disease. Consequently, one of the critical factors in helping individuals with paranoid schizophrenia to successfully live with this disease is the "person's willingness to submit to treatment." He said that people with paranoid schizophrenia often have a difficult time complying with treatment, however, because of the paranoia; it is difficult for them to trust others, including treatment providers. A person suffering from this illness who has been medication noncompliant in the past is much less likely to become medication compliant in the future. Dr. Sabine testified that, based on his evaluation of J.M., significant evidence existed that J.M. was resistant to treatment *647 or to even acknowledging his difficulties even when Dr. Sabine told him directly that treatment and willingness to get treatment might be critical to his ability to parent the Children.
Dr. Sabine explained that most noncompliant paranoid schizophrenics lack the ability to exercise good judgment, a trait that parents should have. He also said that the unpredictability of J.M.'s disease could put the Children at risk because, while J.M. might function as a good parent one day, he could later begin to believe that the Children were conspiring against him.[2] Dr. Sabine opined that a high probability exists that J.M. will not be able to parent effectively and that the interests of the Children would be served best by not being in an environment "where they couldn't quite predict or understand how this person was behaving or where they were coming from." Dr. Sabine, however, admitted that he could not say with certainty that J.M.'s illness would prevent him from being able to successfully parent his children or that he would remain noncompliant in the future.
Cheryl Polly ("Polly"), a licensed professional counselor in Wichita Falls, testified that B.L.M. and J.L.M. were referred to her for counseling by their Child Protective Services caseworker. She testified that the Children need a stable home, consistent direction and consistent care. Polly worked at the Mental Health-Mental Retardation facility in Tyler for about seven years, and testified that based on her experience individuals suffering from paranoid schizophrenia must be treated consistently with medication. She said that some schizophrenics who maintain their treatment and medication regime may function at a high level, others may not. Persons suffering from paranoid schizophrenia who are employed are almost always on medication. Even then, they sometimes experience difficulty maintaining employment because delusions sometimes occur at work. Polly said that it is not possible, however, for a person suffering from paranoid schizophrenia to maintain a job and function at a high level if he or she is not taking medication. Finally, Polly testified that paranoid schizophrenics can view others as enemies, even their own children, and that, in her opinion, J.M.'s chances of being a sufficient parent are not very good given his current mental health. Polly conceded, however, that she had "no clinical experience" with J.M. and could not say that he would be unable to be a fit parent for the Children sometime before the Children turned eighteen.
The trial judge questioned the Children in chambers in an effort to gain some understanding of how they felt concerning the situation. The Children stated that their father calls them on the telephone weekly, he never does anything to scare them, and that he used to feed them hot dogs and candy. When asked how they would like to "start all over again with a new family," B.L.M. responded by saying, "It would be better than with my mama *648 and daddy." When the judge asked the Children how they would feel if they were never allowed to see their parents again until they reach the age of eighteen, at which point they could see them if they so desired, B.L.M. said she wouldn't feel happy or sad and J.L.M. said "good." Finally, the Children both responded that they would be "happy" if they were told that they were not allowed to see their father until age eighteen. B.L.M. explained she would feel happy "because he wouldn't make the right decisions."
J.M. is correct that no witness testified with certainty that in all reasonable probability his mental disease will continue to render him unable to provide for the Children's needs until their eighteenth birthday. But certainty is not the governing standard. Instead, TDPRS bore the burden of proving by clear and convincing evidence that J.M.'s mental illness, "in all reasonable probability," will continue to render him unable to care for the Children until they reach the age of eighteen. Tex. Fam.Code Ann. § 161.003(a)(2). "In all reasonable probability" does not mean beyond a reasonable doubt. Salas v. Tex. Dep't of Protective & Regulatory Servs., 71 S.W.3d 783, 790 (Tex.App.-El Paso 2002, no pet.). Nor does the subsection require scientific certainty. Id.
Applying this standard, viewing all the evidence, giving due consideration to evidence that the fact finder could reasonably have found to be clear and convincing, the evidence presented is such that a fact finder could reasonably form a firm belief or conviction that in all reasonable probability J.M. will be unable to provide for the Children's physical, emotional, and mental needs until their eighteenth birthdays. See Tex. Fam.Code Ann. § 161.003(a)(2); In re C.H., 89 S.W.3d at 25. J.M. himself testified that he did not intend to take medication for his disease. In fact, he denied that he had a disease. Both Polly and Dr. Sabine testified that paranoid schizophrenia is a life-long illness requiring consistent treatment and medication to enable an individual with the disease to function at a high level. They both stressed that a person suffering from paranoid schizophrenia must take medication in order to maintain a lifestyle conducive to parenting children. They both testified that the likelihood of a noncompliant paranoid schizophrenic consistently functioning at a high level is extremely low. Dr. Sabine explained the grave risks medication noncompliant paranoid schizophrenics create for those around them. We overrule J.M.'s fifth issue. See, e.g., In re D.L.N., 958 S.W.2d 934, 941 (Tex.App.-Waco 1997, pet. denied); Altamirano v. Dir. of Travis County Child Welfare Unit, 465 S.W.2d 393, 395 (Tex.Civ.App.-Austin 1971, no writ).
Because we have held that factually sufficient evidence exists to support termination of J.M.'s parental rights under family code section 161.003, we need not address J.M.'s factual sufficiency challenges to the remaining grounds for termination found by the trial court under section 161.001, subsections C, D, F, and O. See In re D.M., 58 S.W.3d 801, 813 (Tex.App.-Fort Worth 2001); In re R.C., 45 S.W.3d 146, 149 (Tex.App.-Fort Worth 2000, no pet.); In re S.F., 32 S.W.3d 318, 320 (Tex.App.-San Antonio 2000, no pet.); see also Tex. Dep't of Human Servs. v. E.B., 802 S.W.2d 647, 649 (Tex.1990) (op. on reh'g). See Tex.R.App. P. 47.1.

V. APPLICABILITY OF AMERICANS WITH DISABILITIES ACT
In his sixth issue, J.M. contends that the ADA applies to termination proceedings and that TDPRS violated the ADA in the course of its treatment of J.M. Specifically, J.M. asserts that TDPRS violated *649 the ADA by failing to accommodate his mental deficiencies and provide him with services designed for his special needs as a schizophrenic. TDPRS responds that J.M.'s ADA complaint is in the nature of an affirmative defense and that J.M. has waived this complaint by failing to plead it and prove it in the trial court.
We agree with TDPRS that J.M.'s ADA complaint is in the nature of an affirmative defense. See In re C.M., 996 S.W.2d 269, 270 (Tex.App.-Houston [1st Dist.] 1999, no pet.). A defendant, however, must plead, prove, and secure findings sustaining an affirmative defense. Woods v. William M. Mercer, Inc., 769 S.W.2d 515, 517 (Tex.1988); In re C.M., 996 S.W.2d at 270. J.M. did not plead or prove his contention that TDPRS violated the ADA by failing to accommodate his mental deficiencies and provide him with services designed for his special needs as a schizophrenic. Accordingly, J.M.'s ADA complaint was waived. See Tex.R. Civ. P. 94; In re C.M., 996 S.W.2d at 270.
J.M. nonetheless contends that, although he failed to plead this affirmative defense, "there is no doubt that [TDPRS] anticipated it under its pleadings by alleging termination under the `mental health' ground" and that he established this defense as a matter of law at trial. J.M. relies upon Shoemake v. Fogel, Ltd., 826 S.W.2d 933, 937 (Tex.1992), and Phillips v. Phillips, 820 S.W.2d 785, 789 (Tex.1991), for the proposition that even if a defendant does not plead an affirmative defense the defendant may raise the defense on appeal when the plaintiff anticipated the defense in its pleading and the defense is established at trial as a matter of law.
The reasoning set forth above in Phillips and Shoemake is inapplicable to this case. The court in Phillips held that the plaintiff's pleading that an agreement was illegal on its face anticipated the defense of illegality. Phillips, 820 S.W.2d at 789-90. Similarly, in Shoemake, the court concluded that "[i]f a child sued a parent for the negligent performance of parental duties, the pleading would effectively anticipate the defense of parental immunity." Shoemake, 826 S.W.2d at 937. Here, it cannot be said that, pleading the parent-child relationship should be terminated under the mental health grounds found in family code section 161.003 anticipates the defense of a possible ADA violation. Additionally, J.M. did not offer any evidence at trial concerning what accommodations or special services he contends should have been provided to him. There is simply no comparison between the present facts and the situations in Phillips and Shoemake.
We overrule J.M.'s sixth issue.

VI. Conclusion
Having overruled J.M.'s fifth and sixth issues on appeal, and having determined that we need not address J.M.'s first through fourth issues, we affirm the trial court's judgment.
NOTES
[1] Dr. Sabine testified:

A. The opinion that I formed was that [J.M.] has schizophrenia, paranoid type. This is a serious and prolonged mental illness, and that he iswas at the time of this evaluationexperiencing the rather labile symptoms of that, including delusional thought, loosening of associations, rambling speech, references to hyper-religious ideas. In a way it's difficult to describe, because we would be talking in a normal fashion about something that was rather concrete, and from time to time in the discourse he would lapse into discussions about metaphorical eyes or spiritual experiences that were not in the context of discussion about religion at all or theology; rather about rather mundane questions about history and so forth.
[2] Dr. Sabine testified:

A. It is the unpredictability of this illness that makes it such a risk; that even though one might effectively parent on a day or two, a month or two down the road one might begin a delusional process that would lead them tolead a parent to feel that their children have a conspiracy against them, or that one of their children are satanically inhabited and needs to be killed orI mean, I'm not saying that he ever said anything like that to me, but in the process of this illness, that is not uncommon for those sort of delusions to come up in the paranoid schizophrenic.
And without his submitting for treatment and having the history of being treated and being willing to be treated, that raises those issues and those risk factors dramatically.