In re J.I., a child

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-04-299-CV

IN THE INTEREST OF J.I., A CHILD

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

I.  Introduction

C.I. appeals the trial court’s judgment terminating her parental rights to J.I.
(footnote: 2)  In her first two points, C.I.
 challenges the legal and factual sufficiency of the evidence 
to support the trial court’s finding that she had endangered J.I. and that 
termination was in J.I.’s best interest.  In her third point, C.I. claims that the Texas Department of Family and Protective Services (TDFPS, also referred to herein as CPS) violated the Americans with Disabilities Act (ADA) by failing to accommodate her disability.  We will affirm.

II.  Background Facts

A. Incidents Prior to C.I.’s and William’s April 23, 2003 Arrest and the Removal of J.I.

1. Escort Service

From 1997 to 2001, C.I. used her home to run an escort service called Sweet Seductions.

2. Relationship with William

In June 2000, C.I. met William through her brother.  At that time, J.I. was almost four years old.  C.I. married William six months later; William had convictions for burglary of a habitation and burglary of a building and was on parole when the couple married.  C.I. testified that William’s parole was revoked based on new theft charges and 
possession of marijuana charges.

C.I. testified that in April 2003
 she learned William was a confirmed member of the Aryan Brotherhood gang.  Although William had previously talked about being in the Aryan Brotherhood, C.I. did not think that “he was truly a confirmed gang member.”  She claimed that she “didn’t know he [had] . . . the FBI file and everything.”  C.I. learned that William had dealt with the Aryan Brotherhood in prison and that “[t]hey were helping him.”  She admitted that she chose to allow J.I. to remain in the same house with William even after she knew of his gang affiliation.
(footnote: 3) 

3. Drug Possession in 2001

In 2001, C.I. was arrested for possession of marijuana.  The marijuana was on top of her entertainment center.  The drugs belonged to C.I. and William, but C.I. said that she claimed the drugs and took the blame because William was on parole.

4. CPS Referrals During 2001

C.I. testified that she was first referred to CPS in 2001 for improperly supervising J.I.  According to C.I., a CPS investigator came and talked to her and then the charges were dropped.  In June 2001, William was accused of domestic violence, causing physical abuse to J.I, but C.I. does not remember what became of that charge.  She also remembered a CPS referral in August 2001, concerning additional allegations of William’s physical abuse of J.I. and allegations that J.I. had killed a cat. 

5. Domestic Violence and Events Surrounding Birth of A.I. in 2001
(footnote: 4)
 Ms. Slack testified that C.I. and William had violent fights before A.I. was born.  They fought “like cats and dogs.”  She saw William hit J.I. once, saw bruises on C.I.’s face, and saw C.I. with a “busted lip.”  Ms. Slack further testified that police responded numerous times to domestic violence calls involving C.I. and William.  She said that on several occasions she offered to take J.I. home with her until the situation calmed, but C.I. never accepted her offers. 

Ms. Slack described one particular incident that occurred while C.I. was pregnant with A.I.  Ms. Slack said that C.I. was fighting with William and told J.I. to scream obscene things at William.  C.I. put J.I. into the car to leave and backed up so quickly that she hit a tree.  The accident threw J.I. into the floorboard of the back seat because he was not strapped into the seat.  William jumped onto the car and beat on the window.  C.I.’s version of the same events was that there was not a fight; there was “a push and a shove.”  C.I. said that she did not tell J.I. to curse.  She also stated that she bumped into the tree; she did not slam into it.  She confessed that she resumed her relationship with William very shortly after this incident because she was eight months pregnant and felt that she needed the baby’s father. 

Ms. Slack stated that she called CPS when A.I. was three months old because C.I. and William “smelled like a marijuana factory” when they took A.I. to the hospital for dehydration.  She explained that she did not request CPS’s intervention earlier because of the family violence.  She testified that she was afraid William would kill her and that William and C.I. are both pretty violent when they are mad.

C.I. admitted that domestic violence occurred 
and that William hit her. She and William had physical altercations while the children were in the house. C.I. said that she was afraid of William because he was a very angry, very violent, passive-aggressive type of person.  She testified that William did not hit J.I. but that William scared J.I. with his voice.  She agreed that William was emotionally abusive to both J.I. and to her.  She said that she feared William so much that she had called 911 “probably a hundred times.”  Twice she and the children left; but she subsequently returned, putting the children back into the same dangerous environment.  CPS had services available to assist C.I. in her efforts to leave the violent situation with William, but C.I. said she was afraid to tell CPS about her situation because she was afraid CPS would immediately rule her an unfit mother and take away her children.
  C.I. agreed, however, 
that it was not good for her children to be in this abusive environment. 

Ms. Slack testified that after A.I. was born, C.I. and her family lived with Ms. Slack for a period of time.  One day, Ms. Slack came home and found C.I. and William drinking, A.I. asleep, and J.I. outside playing
 without supervision. Shortly thereafter, C.I. and William moved out of Ms. Slack’s house. 

6. Neglectful Supervision Referrals in 2002

C.I. testified that CPS referrals occurred in September and December  2002 for neglectful supervision.
(footnote: 5)  CPS’s allegations of neglectful supervision were based on accounts from neighbors who observed J.I. and A.I. wandering unsupervised in the neighborhood and based on J.I.’s truancy from Bergen Elementary School.  The attendance clerk told CPS that J.I.’s school attendance was poor and that truancy officials had been contacted.   

Ms. Slack also testified that whenever she went to visit her son’s family at their apartment, J.I. was always gone.  C.I. told her that J.I. was “hanging out” with the painters and maintenance men at the apartment complex.  When Ms. Slack questioned C.I. about her decision to allow J.I. to do this, C.I. stated, “[W]ell, [J.I.] wants to.  They like him.”  Ms. Slack said that one day her daughter went to C.I.’s apartment and found that C.I. had barricaded herself inside the apartment and would not let J.I. enter. 

On December 27, 2002, CPS worker Christina Enriquez tried to make initial contact with the family.  While she was walking up the family’s driveway to the front door, Enriquez smelled a strong aroma she believed to be marijuana. She noticed that the smell was coming from the house.  After she and her coworker identified themselves, William asked them to hold on a minute; then, he walked into the house and locked the doors.
(footnote: 6)  Enriquez called Arlington law enforcement to help, and they knocked on the door.  However, no one answered, so Enriquez and her coworker gave up and left.  

CPS subsequently mailed a letter by certified mail and by regular letter to the family requesting that they come to CPS’s office for an interview and to discuss the neglectful supervision allegations.  C.I. contacted CPS and made an appointment.  During the interview, C.I. and William initially
 denied that J.I. and A.I. were ever outside alone; later, they indicated that J.I. did play outside alone at different hours of the day, but claimed to watch him from a window. C.I. and William explained J.I.’s truancy, indicating that they had experienced conflicts with J.I.’s teacher
(footnote: 7) and had concluded that J.I. did not need to be in school at that time.  J.I. missed forty-five days of school
—approximately half a semester—from late 2002 to early 2003.  C.I. received truancy warnings for J.I.’s absences and spoke with the superintendent.  At trial, C.I. admitted that J.I.’s school absences were her fault, and she agreed that J.I. needed to be in school.

C.I. told Enriquez that she had attention deficit hyperactivity 
disorder and bipolar disorder.
(footnote: 8)  William also indicated that he had a disorder.  During the interview, C.I. initially denied any drug use, but later she admitted to recently using marijuana.  Enriquez also learned that William had violated his parole on two occasions by testing positive for marijuana.  Enriquez ruled the case “reason to believe for neglectful supervision of both J.I. and A.I.”  Enriquez completed a safety plan to reduce the risk of any further neglectful supervision of the children, and both C.I. and William signed it.  Enriquez recommended opening up family-based services to the family, and CPS opened a case to attempt to provide assistance to them.  The case was eventually closed, however, because CPS was unable to locate the family to follow through with the services.  According to C.I., the family did not move; they lived at the house and waited for William to get out of Wackenhut for technical violations of his parole. 

7. Incidents in Early 2003

On January 14, 2003, neither C.I. nor William would complete a drug test.  On February 28, 2003, C.I. and William withdrew J.I. from school after he had missed forty-seven of the eighty-three days that he was enrolled.  

In April 2003, C.I. and her family were living in their Jeep. 
 Ms. Slack testified that William told her that they had been camping at Joe Pool Lake because C.I.’s mother’s residence in Arlington was tied up in probate.

B. C.I.’s and William’s Arrest on April 23, 2003

Officer Richard Jablon testified that on April 23, 2003, he responded to a suspicious persons call, which resulted in an arrest report.  Pawn shop employees called 911 when C.I. and William arrived.  The employees had been advised by police detectives to be on the lookout for the couple because they were suspects in residential burglaries.  When Officer Jablon arrived at the pawn shop, William was inside trying to pawn a bicycle, while C.I. and the children waited in a Jeep outside the pawn shop.  Officer Jablon noted that the condition of the Jeep was very cluttered; lots of trash and food products filled the Jeep’s interior.  
Officer Jablon ran a warrant check; William and C.I. both had outstanding warrants.  Warrants had issued for C.I.’s arrest based on tickets for speeding, no insurance, and failure to use a seatbelt. 

Police arrested William; a search incident to his arrest revealed marijuana in a baggie in his pocket.  William was charged with possession of marijuana and burglary. A search of the Jeep revealed a two-inch-long marijuana cigarette in the ashtray in the front console near C.I.’s position in the front driver’s seat.  Consequently, Officer Jablon charged C.I. with possession of marijuana.  Ultimately, C.I. received thirty days’ confinement for the possession charge. 

Between the front seats, Officer Jablon located a cooler containing a pipe used to smoke marijuana.  In a towel, Officer Jablon found two glass pipes used to smoke methamphetamine and a small wire used to push the drug through the pipes.  In the glove compartment, Officer Jablon found small pieces of tin foil containing a burned residue, probably methamphetamine.  He charged C.I. with possession of drug paraphernalia based on the marijuana-smoking pipe, the glass pipes, and the tin foil.  Officer Jablon called CPS because, in his opinion, the children’s presence in a vehicle containing this drug paraphernalia endangered them.  
He also noted that the Jeep contained a circular saw, a tool set, and a hatchet, which were all possibly stolen items. 

C.I. told Ms. Slack that she (C.I.) was just as guilty of the burglaries as William and that the children were in the Jeep during the burglaries.  C.I. said that as she was driving, William would walk down the sidewalk looking for open garages; then, he would retrieve items and put them in the Jeep.  Ms. Slack expressed concern that C.I. was involving the kids in the burglaries. 

C.I. testified to her version of the events of April 23, 2003.
(footnote: 9)  On that day, she was in her Jeep with her two children waiting for William to pawn an item. She claimed that she did not know at the time that William had been involved in several burglaries.  She just knew that William had violated his parole by not showing up to see his parole officer.  She stated that Ms. Slack’s testimony that C.I. admitted to participating in the burglaries was incorrect.  She also said that she did not know until she visited with William that he had placed marijuana between the ashtray and the dash, and when she spoke with her case worker, she denied having marijuana in the car with her.  She said that she pleaded guilty to possession of marijuana because she thought that she was guilty based on the fact that she owned the Jeep.  C.I. admitted that a bag with drug paraphernalia was hidden in the back of the Jeep.  When asked why it was there
, C.I. admitted, “We had a drug problem.”  C.I. agreed that both children were put in a dangerous situation by being placed inside a vehicle where marijuana and methamphetamine use occurred. 

When asked where she was living on the day of the arrest, C.I. said that she had inherited her mother’s home, which had black mold, and that they were living there.  She said that she did not want anybody to know too much because Ms. Slack constantly called CPS and sent them to her house. 

C. Removal of Children

When C.I. and William were arrested, they were not able to provide law enforcement or CPS with the names of relatives or friends for placement of the children.  Because she was familiar with the family, Enriquez was assigned the April 23, 2003 CPS referral by Officer Jablon.  
The children had nowhere to go, so CPS completed an emergency removal.  CPS conducted an abbreviated home study on Ms. Slack and received court approval for temporary placement of both children in her home.
(footnote: 10)  Enriquez ruled the case “reason to believe for neglectful supervision.” 

Shortly a
fter C.I. and William were arrested, Ms. Slack went to get A.I.’s carseat out of the Jeep, which had been impounded.  Ms. Slack left the carseat in the Jeep because it was filthy.  She found clothes in the Jeep that were soiled with urine or feces and noticed that the vehicle had lots of fast food wrappers and papers scattered throughout.  Ms. Slack also went to C.I.’s house in Arlington to retrieve the children’s Medicaid cards.  The house did not have electricity, lawnmowers had been placed inside the house, and a dog “in bad shape” was in the back yard.

D. Post-Arrest and Post-Removal Incidents in 2003 and 2004

1. J.I.’s Interview and Foster Placement

On April 29, 2003, Enriquez interviewed J.I., who was under age twelve.  J.I. stated that his parents used marijuana and described an incident when C.I. unknowingly handed him a joint because she thought J.I. was William.  J.I. explained that “friends” would come to his home and give William drugs, and William would pay for them.

In June 2003, Ms. Slack asked CPS to remove J.I. due to his erratic behavior.  Ms. Slack said that she was afraid that J.I. was going to injure his sister or burn down her house.  She left a message with CPS that living with J.I. was like having a wild animal in her house.  CPS accommodated Ms. Slack by removing J.I. and placing him in a therapeutic foster home.  

2. C.I.’s Efforts at Drug Rehabilitation and Employment

In July 2003, C.I. completed thirty days in a drug treatment program at Pine Street.  After C.I. completed rehabilitation, she called Ms. Slack because C.I. was about to be evicted from her apartment and needed a new tire for her vehicle.  Ms. Slack offered C.I. a mobile home where she could live until she could get on her feet and get a job.  Ms. Slack also took C.I. to interviews and bought her clothes.  Ms. Slack testified that C.I. went to work at a couple of different places but only for a day or two; she said that C.I. had approximately four jobs in a month and a half.  C.I. blamed her loss of jobs on Ms. Slack.  She said that Ms. Slack had called her employers and told them that CPS had removed her children and that C.I. had a criminal history.  She admitted that Ms. Slack paid her bills for three to four months. 

Ms. Slack testified that C.I. told her in approximately August of 2003 that she had “fallen off the wagon” and had been smoking marijuana with her next-door neighbor. 

In September 2003, Christy Wright began handling J.I.’s case.  At that time, the service plan for C.I. included attending MHMR, attending
 parenting classes, completing a drug assessment, completing drug treatment, giving random UA’s, obtaining housing, and obtaining and maintaining a job.  In October 2003, C.I. admitted to Wright that she had used marijuana twice in the past week, but C.I. managed to pass her UA.  C.I. testified that she felt very guilty in October 2003 for taking two hits off a joint because she had been clean for six months, so she told her caseworker and Ms. Slack because she needed and wanted help.  She admitted that her use in October occurred after she had already completed the detoxification program at Pine Street.

3. Arrests in 2003

On November 11, 2003, police arrested C.I. for failing to pay her restitution.  She paid for some unpaid tickets and made bond the same day.  On November 20, 2003, police arrested C.I. for theft and driving while her license was suspended.  C.I. stated that on that date she was on two different mood stabilizers and that she should have been on just one because the two mixed together were dangerous.  She admitted that she was not in her right mind when she was arrested.  She explained that she had over four hundred dollars in her pocket without knowing why and that she went to the store and opened a package of meat.  She said that she left the opened package at the store but that she was arrested for attempting to steal meat.  She said that she bonded out of jail after two days.  The court placed C.I. on probation for both offenses. In December 2003, CPS created a new service plan for C.I., reiterating the same things as the first plan. 

4. Change in Service Plan

CPS changed its plan to termination in January 2004.  In February 2004, CPS changed C.I.’s service plan to require her to attend Narcotics Anonymous meetings, to obtain the name of her sponsor and give it to her case worker, to complete a drug assessment through CATS, to comply fully with their recommendations, to participate in a psychological evaluation, and to address her mental health issues with MHMR.  The new plan also required C.I. to demonstrate the skills she had learned about in her services, to demonstrate that she is a responsible parent, and to attend and participate in parenting classes.

5. Psychological Evaluation

On March 16, 2004, Dr. Cathy DeOrnellas conducted a psychological evaluation on C.I.  She noted that C.I. had significant difficulty completing the intake paperwork; although the paperwork normally takes fifteen minutes for a patient to complete, Dr. DeOrnellas had to spend two hours going over the paperwork with C.I. because she was concerned that the information might be used against her in some way.  Throughout the testing, C.I. needed a lot of reassurance that she was doing well. 

The testing revealed that C.I.’s IQ is in the average range and that she does not have any major emotional or personality problems.  The areas of concern were that C.I. has variable moods that tend to be elevated at times beyond what is considered normal and that she tends to be suspicious regarding other people’s motives.  Additionally, she had minimal symptoms of depression; she tended to be nervous; she had a borderline antisocial feature, meaning that she had a hard time interacting with people; and she reported zero problems with parenting in an attempt to make herself look better than she was.  Dr. DeOrnellas noted that C.I. had an unusual relationship with J.I.—she treated him as an equal rather than as a child.  Dr. DeOrnellas said that C.I. was not very interested in treatment because she felt like she did not have a problem. Dr. DeOrnellas recommended that C.I. stay in counseling, continue visitation with her children as CPS allowed, attend parenting classes, and be monitored for drug and alcohol abuse.
(footnote: 11)  She concluded that it was possible for C.I. to have trouble completing the service plan because C.I. lacked a support system, had problems making decisions, was depressed, and took almost a year to get her psychological evaluation.

6. Possession of Cocaine

Police arrested C.I. in April 2004 for felony possession of cocaine.  C.I. asked Ms. Slack to bail her out and admitted to using cocaine. C.I. said that she did not mention trying cocaine to Ms. Slack and that she never asked her to bail her out of jail.  C.I. said that she was not using cocaine in April 2004; she was selling it for money to move back to Granbury.  C.I. told her case worker that she did not know how the cocaine got into her suitcase. She admitted that she pleaded guilty to possession of cocaine and was on three years’ probation.

7. Compliance with Probation Conditions

Jennifer Davis, C.I.’s adult probation officer with Hood County, testified that she was assigned C.I.’s case after C.I. was placed on probation for driving while her license was suspended and for theft.  The original term of C.I.’s probation was six months, and C.I. was to pay fines, court costs, and restitution.  Ms. Davis stated that C.I. had kept current with her reporting and her fees and that all five of C.I.’s drug tests had been clean.  Ms. Davis stated that up until April 2004, C.I. had done well as a probationer.

Because C.I. committed the offense of possession of cocaine in Bosque County in April 2004, she was required to attend STAR counseling for drug treatment and to complete twenty days in jail on the weekends.  C.I. successfully completed the STAR program.

8. Anger Management

Christie Guion, the CASA volunteer assigned to this case, testified that once when Ms. Slack brought the children to a visit C.I. became very upset and started yelling at Ms. Slack.  Ms. Guion said that J.I. was frightened.  Ms. Guion also witnessed C.I. get upset in the courtroom one time.

Wright testified that she had also seen anger management issues in C.I. At the mediation on March 5, 2004, C.I. became very angry when she heard that the therapist was recommending that J.I.’s visits be reduced to every other week for two hours.  C.I. stated that she wanted more time with J.I. and that she wanted another opinion from a different professional.

At the June 2, 2004 status review, C.I. accused Wright of changing the service plan by constantly adding services and told Wright that she wanted a new caseworker.  C.I. said that she and Wright had irreconcilable differences, she wanted a new CASA volunteer because hers was biased, and she yelled at the judge that “yes, she was in anger management.”  C.I. began anger management classes in June, but she had not completed them at the time of the termination hearing.

Ms. Slack also testified regarding C.I.’s anger.  She stated that C.I. still had problems controlling her anger and that she blew up when she was served with papers regarding a court date on A.I.’s conservatorship.  Because of C.I.’s behavior during several of the visits with A.I., Richard Davis was hired to supervise the visits.  On July 13 and 14, 2004, Davis noticed a change in C.I.’s behavior that caused him concern.  C.I. wanted Davis to write a report; he said that if he did write a report, it would just include the facts of the visitation.  At that point, C.I. fired him and said that she was going to sue him for slander. C.I. did all of this in front of A.I. at a public park.  Thereafter, Davis recommended that the visits between C.I. and A.I. be conducted in restricted settings and be videotaped and audiotaped, that random drug screenings be conducted based on C.I.’s erratic behavior and the pending charges against C.I. for possession with intent to sell, and that C.I. be required to consult with a licensed mental health counselor regarding her visitation because of her outbursts and comments that people tell lies about her.  When the visits were moved to McDonald’s, C.I. acted appropriately.

C.I. agreed that there were times when she had uncontrolled anger outbursts, but she said that some of the incidents were blown out of proportion because sometimes she was just expressing her opinion or talking loudly.  C.I. denied that she had an anger outburst in Granbury relating to visitation with A.I. 9. C.I.’s Visitation with Children

Guion testified that J.I. seemed glad to see his mother during visits, but he did not seem particularly bonded to A.I.  Guion observed J.I. being a parent to A.I. and initiating activities with his mom because she did not ask him about school, sports, church, or his friends while Guion was present.  Instead, C.I. just read her parenting class notes to J.I. and told him the twelve-step process from Narcotics Anonymous.  She yelled at J.I. when he became disinterested.  During one visit, C.I. talked to J.I. about the case.  The CPS worker terminated the visit because C.I. had been warned not to talk to J.I. about his biological father. 

10
. C.I.’s Compliance with CPS Plans

Wright testified that throughout the course of the case
 C.I. exhibited angry outbursts, including yelling in the courtroom, slamming down the phone in Wright’s ear, yelling at Wright, cursing at Wright, and becoming very angry after a visit.  Wright confirmed that C.I. still has mood swings and that sometimes C.I. is off her bipolar medications. 

CPS paid for C.I. to attend parenting classes in Granbury, and she successfully completed those classes in March 2004.  However, Wright testified that C.I. is not displaying the skills she learned from her parenting classes and is still not exhibiting appropriate parenting skills.  

C.I. waited almost four months to get her drug assessment.
(footnote: 12)  Wright testified that because of how late in the process the assessment was done, it limited her ability to come up with appropriate services for C.I.  Wright stated that the late drug assessment left little time to see if C.I. internalized anything from the drug rehabilitation sessions and was done too late to help C.I. get in a position to get J.I. back.  Despite the lateness of the assessment, C.I.’s urinalysis tests never tested positive for marijuana or cocaine.  

One thing that deeply concerned Wright was C.I.’s inability to refrain from committing criminal acts, as evidenced by her April 2004 arrest for possession of a controlled substance.  The Child Advocate Report that was filed shortly after the hearing stated that there are two criminal cases pending against C.I.

11. C.I.’s Current Status

C.I. lives in a house that she is buying from Ms. Slack.  She is current on her house payments and also pays insurance and taxes. 
 She receives Social Security Disability Income for her bipolar disorder in the amount of $600 a month and has several thousand dollars in inheritance money.
(footnote: 13)  She does home health, but she did not have proof of employment because she did not have a driver’s license at the time of the hearing; she stated that she would get her driver’s license back in September.
(footnote: 14)  She stated that she sees three counselors a week at MHMR.  She stated that she loves her anger management counselor and is going to take some additional classes on grieving. 

She made a decision at mediation in March or April 2004 to allow A.I. to be placed with Ms. Slack.  She knew that she could not handle both kids.  She was going to deal with her issues so that she could get J.I. back.  However, she admitted that one month after giving up A.I., she decided to sell cocaine because she was very depressed.

12. J.I.’s Status

Ms. Slack testified that when J.I. moved in with her, she noticed fairly quickly that he had behavioral problems.  She said that he was naturally angry, began to hurt his sister and bruise her, injured Ms. Slack’s dog and Ms. Slack’s daughter’s dog, set fire to his bedroom, and dirtied his underwear.
(footnote: 15) 

J.I.’s counselor testified that the major concerns when J.I. first started counseling were daily encopretic episodes, physical aggression, and difficulty with structure and rules.  She testified that children with encopresis have suffered some sort of abuse in the past or some sort of serious stress and have difficulty expressing their feelings because they do not feel safe in their surroundings.  She said that living in his mother’s home “had to have been a contributing, major contributing, factor for his behavior when he arrived.”  
J.I. talked to his counselor about having a video tape thrown at him, the yelling and screaming that went on in his house, and the lack of a consistent place to live when he was with his mother.  After several months in foster care, J.I. stopped his encopretic behavior.

Around the time of the visits with his mother, J.I.’s behavior tended to deteriorate; he had nervous tics, difficulty controlling himself at home and at school, more trouble complying with rules, hyperactive behavior, and non-responsive defiance.  It took J.I. a couple of days after each visit with his mom to “get back on a more even keel.”  After the frequency of the visits were reduced to every other week, J.I. had a shorter recovery period.  During the initial visits, J.I.’s counselor noted that J.I. acted in “pseudo-maturity,” wanting to make the rules and act in an adult role.  Now, he demonstrates more age-appropriate behavior.

According to J.I.’s counselor, now J.I. is a much better behaved child who only has occasional behavioral problems relating to competitiveness and problem-solving.  Guion testified that J.I. has transformed in a year; he went from being insecure, having encopresis, and missing lots of school to making friends and taking school seriously.  Ms. Slack also testified that J.I. has improved in his behavior since being placed in foster care; he has come out of his shell, is happy, caring, talkative, and loving towards his sister.  She said that she will do what she can to make sure that A.I. and J.I. continue their relationship as siblings.

J.I. is one grade behind in school because he missed most of kindergarten.  He fits in with other kids and is involved in a church group, Boy Scouts, and soccer.

III.  Sufficiency of the Evidence

In her first point, C.I. argues that there was no evidence or insufficient evidence to support the trial court’s finding that she had in any way endangered J.I.  Specifically, C.I. contends that the evidence presented by the State to prove the grounds for termination was legally and factually insufficient to sustain a termination by clear and convincing evidence.  TDFPS argues that there is ample evidence to support the trial court’s findings. 

A. Standard of Review

The Texas Supreme Court recently clarified the appellate standards of review to be applied to legal and factual sufficiency of the evidence challenges in light of the clear and convincing evidence burden of proof in termination proceedings.  
In re J.F.C., 
96 S.W.3d 256, 264-68 (Tex. 2002) (discussing legal sufficiency review); 
In re C.H.,
 89 S.W.3d 17, 25 (Tex. 2002) (discussing factual sufficiency review); 
In re J.T.G.
, 121 S.W.3d 117, 124 (Tex. App.—Fort Worth 2003, no pet.).
  Because termination findings must be based upon clear and convincing evidence, not simply a preponderance of the evidence, the supreme court has held that the traditional legal and factual standards of review are inadequate.  
J.F.C., 
96 S.W.3d at 265; 
C.H.,
 89 S.W.3d at 25; 
J.T.G.
, 121 S.W.3d at 124.
  Instead, both legal and factual sufficiency reviews in termination cases must take into consideration whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the matter on which the State bears the burden of proof.  
J.F.C.
, 96 S.W.3d at 265-66; 
C.H.,
 89 S.W.3d at 25; 
J.T.G.
, 121 S.W.3d at 124. 
 With respect to a legal sufficiency point, we “look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true.”  
J.F.C.,
 96 S.W.3d at 266; 
J.T.G.
, 121 S.W.3d at 124-25
.  In determining a factual sufficiency point, we must give due consideration to evidence that the fact finder could reasonably have found to be clear and convincing and then determine whether, based on the entire record, a fact finder could reasonably form a firm conviction or belief that the parent violated one of the provisions of section 161.001 and that the termination of his or her parental rights would be in the child’s best interest.  
Tex. Fam. Code Ann. 
§ 161.001 (Vernon 2002); 
C.H.
, 89 S.W.3d at 25; 
J.T.G.
, 121 S.W.3d at 125. 
B. Law on Endangerment

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one or more of the acts or omissions enumerated under subdivision (1) of the statute and must also prove that termination is in the best interest of the child.  
Tex. Fam. Code Ann.
 § 161.001(1); 
Richardson v. Green
, 677 S.W.2d 497, 499 (Tex. 1984).  Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact.  
Tex. Dep’t of Human Servs. v. Boyd
, 727 S.W.2d 531, 533 (Tex. 1987).

Endangerment means to expose to loss or injury, to jeopardize.  
Boyd
, 727 S.W.2d at 533; 
J.T.G.
, 121 S.W.3d at 125; 
see also In re M.C.
, 917 S.W.2d 268, 269 (Tex. 1996). 
 To prove endangerment under subsection D, TDFPS had to prove that C.I. (1) knowingly (2) placed or allowed J.I. to remain (3) in conditions or surroundings that endangered his physical or emotional well-being.  
Tex. Fam. Code Ann. 
§ 161.001(1)(D).  
Under section 161.001(1)(E), the relevant inquiry is whether evidence exists that the endangerment of the child’s physical well-being was the direct result of the parent’s conduct, including acts, omissions, or failures to act.  
J.T.G.
, 121 S.W.3d at 125.  Additionally, termination under section 161.001(1)(E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required.  
Tex. Fam. Code Ann.
 § 161.001(1)(E); 
J.T.G.
, 121 S.W.3d at 125.  
However, it is not necessary that the parent’s conduct be directed at the child or that the child actually suffer injury.  
Boyd
, 727 S.W.2d at 533; 
J.T.G.
, 121 S.W.3d at 125.  The specific danger to the child’s well-being may be inferred from parental misconduct standing alone.  
Boyd
, 727 S.W.2d at 533; 
In re R.W.
, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).

A parent’s failure to maintain a home may constitute conduct that endangers a child’s well-being.  
See In re S.G.S.
, 130 S.W.3d 223, 238 (Tex. App.—Beaumont 2004, no pet.).  Stability and permanence are paramount in the upbringing of children.  
See In re T.D.C.
, 91 S.W.3d 865, 873 (Tex. App.—Fort Worth 2002, pet. denied).  A fact-finder may infer from past conduct endangering the well-being of a child that similar conduct will recur if the child is returned to the parent.  
See In re D.L.N.
, 958 S.W.2d 934, 941 (Tex. App.—Waco 1997, pet. denied), 
disapproved on other grounds by J.F.C.
, 96 S.W.3d 256, and
 C.H.
, 89 S.W.3d 17.

Moreover, a parent’s repeated criminal acts may constitute sufficient evidence of conduct that endangers the well-being of a child.  
In re J.N.R.
, 982 S.W.2d 137, 143 (Tex. App.—Houston [1st Dist.] 1998, no pet.), 
disapproved
 
on other grounds by C.H.
, 89 S.W.3d 17.  Illegal drug use in the child’s household constitutes surroundings that endanger the well-being of the child under subsection D.  
In re D.C.
, 128 S.W.3d 707, 715-16 (Tex. App.—Fort Worth 2004, no pet.).  Violent or abusive conduct by someone within the household also constitutes an environment that endangers children.  
In re K.A.S.
, 131 S.W.3d 215, 222 (Tex. App.—Fort Worth 2004, pet. denied). Further, a parent’s mental state may be considered in determining whether a child is endangered if that mental state allows the parent to engage in conduct that jeopardizes the physical or emotional well-being of the child.  
R.W.
, 129 S.W.3d at 739.

C. Application of Law to Facts

The evidence at trial, summarized above, demonstrated that C.I. failed to provide J.I. with a safe and stable environment.  C.I. subjected J.I. to a oftentimes chaotic and nomadic lifestyle.  She had a violent temper and routinely screamed at others in J.I.’s presence.  She was physically violent with William in J.I.’s presence and had to call the police many times to intervene in their bouts of domestic violence. 

C.I. also persisted in criminal conduct that resulted in incarcerations that prevented her from parenting J.I.; her criminal conduct continued even after her children had been removed and her parental rights were at stake.  J.I. witnessed William burglarize houses because C.I. and William allowed the children to ride in the car during their criminal activities.  J.I. also witnessed C.I.’s drug abuse and William’s drug purchases and was mistakenly handed a joint by C.I. on one occasion.  C.I. chose to take illegal drugs instead of her bipolar medications, which resulted in abnormal mood swings.  
C.I. failed to demonstrate appropriate parenting skills as reflected by several CPS referrals for neglectful supervision, the escort service she ran from her home, J.I.’s numerous absences from school, and her continuous relapses into drugs and anger outbursts after taking classes to redress her drug addiction and anger management problems. 

We have carefully reviewed the entire record.  Looking at all the evidence in the light most favorable to the jury’s finding, giving due consideration to evidence that the fact finder could have found to be clear and convincing, we hold that a reasonable trier of fact could have formed a firm belief or conviction that C.I. knowingly placed J.I. in harmful circumstances and engaged in conduct that endangered his physical or emotional well-being.  
See R.W.
, 129 S.W.3d at 743-44;
 J.T.G.
, 121 S.W.3d at 127; 
see also D.C.
, 128 S.W.3d at 715.  We overrule C.I.’s first point.

IV.  Best Interest of the Child

In her second point, C.I. argues that there was no evidence or insufficient evidence to support the trial court’s finding that termination was in J.I.’s best interest.  Specifically, C.I. argues that the State chose to terminate her rights as to J.I. but not as to A.I., causing the separation of siblings who were bonded,
(footnote: 16) and that the State failed to present evidence of the suitability of the foster family to raise J.I.

A strong presumption exists that the best interest of a child is served by keeping custody in the natural parent.  
In re W.E.C.
, 110 S.W.3d 231, 240 (Tex. App.—Fort Worth 2003, no pet.).  The fact finder may consider a number of factors in determining the best interest of the child, including the following: the desires of the child, the present and future physical and emotional needs of the child, the present and future emotional and physical danger to the child, the parental abilities of the person(s) seeking custody, programs available to assist those persons in promoting the child’s best interest, plans for the child by those individuals or by the agency seeking custody, the acts or omissions of the parent that may indicate that the existing parent-child relationship is not appropriate, and any excuse for the acts or omissions of the parent.  
Holley v. Adams
, 544 S.W.2d 367, 371-72 (Tex. 1976); 
W.E.C.
, 110 S.W.3d at 240. “Best interest” does not require proof of any unique set of factors, nor does it limit proof to any specific factors.  
Holley
, 544 S.W.2d at 371-72; 
W.E.C.
, 110 S.W.3d at 240.  Quite often, the best interest of the child is infused with the statutory offensive behavior.  
W.E.C.
, 110 S.W.3d at 240.  While there are instances where the offending behavior will demand termination of parental rights, there are also those cases where the best interest determination must have a firm basis in facts standing apart from the offending behavior. 
 Id.
  Although such behavior may reasonably suggest that a child would be better off with a new family, the best interest standard does not permit termination merely because a child might be better off living elsewhere. 
Id.
  Termination should not be used to merely reallocate children to better and more prosperous parents.  
Id.

J.I. did not testify at trial.  J.I.’s counselor testified that he has started to bond with his foster parents and that he is ready to have closure.  J.I.’s CASA volunteer testified that he respects, obeys, and seems concerned about his foster parents and is thriving in their very structured home. 
 She recommended permanently removing J.I. from C.I. and allowing his foster parents to adopt him.  Wright, the CPS caseworker, also testified that she would like to make J.I.’s placement in his current foster home a permanent situation because it has the ability to provide him with a long-term safe, nurturing placement.

Dr. DeOrnellas
 interviewed J.I. and concluded that he was at risk for attention problems; unusual or immature behavior, social skills, and leadership skills; and developing a conduct disorder.  Her recommendations for J.I. were to allow him to be a little boy, to prevent him from listening to adults’ conversations, to have him attend counseling and play therapy, and to limit his exposure to television and video games. 
 The record revealed that J.I. requires a structured, stable, stimulating environment with consistent rules and nurturing in order to thrive.  J.I.’s counselor testified that J.I. has overcome many of his behavioral problems because he has been in a stable, consistent, nurturing, age-appropriate environment where he has not had to be concerned with food, water, and shelter.

The endangering course of conduct discussion above addressed the present and future physical and emotional dangers to J.I., as well as C.I.’s difficulties parenting.  C.I.’s violent behavior—resulting from her abuse of drugs and her failure to properly take her bipolar medications—led to citations for theft and possession of marijuana, drug paraphernalia, and cocaine and to time in jail.  Moreover, C.I.’s continued relationship with William also placed J.I. at risk for harm. Therefore, TDFPS’s plan for J.I. was to terminate C.I.’s parental rights and place him for adoption with his foster parents,
(footnote: 17) which would provide the stability lacking under the status quo.

With regard to the parental abilities of the foster parents, J.I.’s foster dad testified that both he and his wife are home when J.I. gets home from school and that his wife does not work.  Since J.I. has been living with his family, they have never had to meet with the school regarding J.I.’s behavior.  He mentioned that J.I. plays soccer, travels to see family, is involved in Rural Rangers at church, and goes to camp during the summer.  He said that J.I. wants to play trombone, like their daughter.  Guion said that J.I. and his foster dad enjoy riding bikes together and camping.  Wright testified that J.I.’s foster parents have talked about how they might be able to put J.I. through college.

The record does not reveal what programs are available to assist J.I.’s foster parents.  However, the record demonstrates that the foster parents’ therapeutic home seems to be addressing J.I.’s physical and emotional needs. The record as outlined above, provides evidence of numerous acts or omissions of C.I. indicating that the existing parent-child relationship is not in J.I.’s best interests.  Giving due consideration to evidence that the fact finder could have found to be clear and convincing, and based on our review of the entire record, we hold that a reasonable trier of fact could have formed a firm belief or conviction that the termination of C.I.’s parental rights would be in J.I.’s best interest.  
See W.E.C.
, 110 S.W.3d at 247.  Accordingly, we hold that the evidence is factually sufficient to support the jury’s best interest finding.  We overrule C.I.’s second point.

V.  Alleged Failure to Accommodate C.I.’s Disability

In her third point, C.I. argues that TDFPS violated the ADA by failing to reasonably accommodate her disability during the administration of the reunification services.  TDFPS responds that C.I.’s complaint was not preserved for appellate review because she failed to properly plead and prove this affirmative defense in the trial court.

We agree with TDFPS that C.I.’s ADA complaint is in the nature of an affirmative defense that must be pleaded to avoid waiver.  
See In re B.L.M.
, 114 S.W.3d 641, 649 (Tex. App.—Fort Worth 2003, no pet.).  
But see S.G.S.
, 130 S.W.3d at 230 (declining to create affirmative defense out of noncompliance with ADA). 
 A defendant relying on an affirmative defense must plead, prove, and secure findings sustaining the defense.  
B.L.M., 
114 S.W.3d at 649 (citing 
Woods v. William M. Mercer, Inc.
, 769 S.W.2d 515, 517 (Tex. 1988)).

Here, C.I. filed a general denial. 
 C.I. failed to plead or prove her contention that TDFPS violated the ADA by failing to accommodate her mental deficiencies associated with bipolar disorder.  Accordingly, C.I. waived her ADA complaint.  
See id. 
 Moreover, although C.I. questioned several witnesses at trial in an attempt to show how TDFPS failed to accommodate her, the record demonstrates that TDFPS took into account C.I.’s mental disorder and took steps to accommodate her, which C.I. rejected. 
 Thus,
 we overrule C.I.’s third point.

VI.  Conclusion

Having overruled each of C.I.’s points, we affirm the trial court’s judgment.

SUE WALKER

JUSTICE

PANEL B: DAUPHINOT, WALKER, and MCCOY, JJ.

DELIVERED: May 5, 2005

FOOTNOTES
1:
See
 
Tex. R. App. P
. 47.4.

2:
J.I. was born on September 14, 1996.  He is C.I.’s son, and his alleged biological father is Michael Breelan.  Breelan did not participate in these proceedings and has filled out documentation giving up his rights to J.I.

3:
At trial, William’s mother, J. Slack, testified that William’s parole was revoked and that he is currently in a maximum security prison serving a ten-year sentence on a Tarrant County charge and an eight-year sentence on a Hood County charge.

4:
A.I. was born on August 17, 2001 and is the daughter of C.I. and William; Ms. Slack is A.I.’s biological grandmother.  Ms. Slack has permanent managing conservatorship of A.I., which C.I. does not challenge on appeal.

5:
At the time, J.I. was six and in kindergarten or first grade. 

6:
C.I. testified that she was in Irving with her mother’s probate attorney on this date. 

7:
The problems were that one teacher would not let J.I. wear shoes with laces and that teachers expressed concerns about J.I.’s hearing. 

8:
After 
C.I.’s mother died in January 2002, she testified that she began using marijuana and methamphetamine instead of her bipolar medications.

9:
She said that on the day of the arrest she had contacted the Women’s Center and was planning to leave William. She was trying to figure out how to get away, and William wanted to stop at a pawn shop.  

10:
C.I. testified that when her kids were taken away from her, she did not realize the serious nature of her conduct at first because she was in shock.  She stated, “I really didn’t know what was going on at the time, but after a while, I got the point.”

11:
C.I. admitted to Dr. DeOrnellas that she was addicted to methamphetamine.

12:
As of the time of trial, C.I. had not received a drug assessment at CATS because she was allowed to do STARS in place of CATS.

13:
With regard to her care for J.I., C.I. testified that she gave him $1,000 in cash from November 2003 to February 2004.

14:
CPS removed the requirement that C.I. maintain stable employment because she is drawing Social Security due to her bipolar disorder.  C.I. continued to be in and out of jobs even after saying that she could not work.

15:
This behavior is known as encopresis.

16:
The record is not clear on the level of bonding between J.I. and A.I.; the CASA volunteer testified that 
J.I. did not seem particularly bonded to A.I., while Ms. Slack testified that J.I. was loving towards his sister.  Whatever the level of bonding, Ms. Slack testified that she would do her best to make sure that J.I. and A.I. 
continued their relationship.

17:
Although J.I.’s current foster parents had not made a decision as of the termination hearing regarding whether they wanted to proceed with adopting J.I., they were leaning towards adoption.