# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-24-00064-CV

---

**Rain Levy Minns Udall, Appellant**

**v.**

**Michael Minns, Appellee**

---

### FROM THE 53RD DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-FM-21-004054, THE HONORABLE AURORA MARTINEZ-JONES, JUDGE PRESIDING

---

## O P I N I O N

Appellant Rain Levy Minns Udall (Mother) appeals from the trial court's final order awarding sole managing conservatorship of her three children to her father, appellee Michael Minns (Grandfather). Mother challenges the trial court's order in four issues. She contends that the trial court erred by (1) concluding that Grandfather had legal standing to bring the suit affecting the parent-child relationship (SAPCR) under Family Code Section 102.004(a)(1); (2) awarding sole managing conservatorship to Grandfather because it incorrectly concluded that he provided sufficient evidence to rebut the statutory presumption for keeping the children with a parent; (3) setting Mother's terms of possession, requiring her to pay child support to Grandfather, and awarding attorneys' fees to Grandfather; and (4) requiring that the children receive counseling about Mother's mental health. For the reasons explained below, we affirm.

Mother has three children: an older girl (Anne), a middle boy (Sam), and a younger girl (Zephyr).[2]  At the time of trial in 2023, Anne was seventeen years old, Sam was fifteen years old, and Zephyr was thirteen years old.  The Texas Department of Family and Protective Services had been involved with the family leading up to Mother's divorce in 2016 from the children's father (who died in 2017).[3]  The Department became involved with Mother and the children again in May 2021.

**The Department's involvement with Mother and the children in 2021**

In May 2021, when Anne was fifteen years old, Sam was thirteen years old, and Zephyr was eleven years old, Anne received treatment at a children's hospital after she fainted. Anne suffers from brainstem migraines and had fainted after headaches before this episode.  The Department received a complaint after Anne was treated at the hospital.  When asked about

---

[1] The facts provided in this section are taken from the evidence admitted at the final bench trial, which was conducted over several days at the end of July and beginning of August 2023.

[2] We refer to the children by fictitious names to protect their privacy.  *See* Tex. Fam. Code § 109.002(d).

[3] The children's father was a drug addict who used and manufactured methamphetamines in the family home.  According to Mother, when she learned about his drug use, she threatened to file for divorce, but she and the children stayed with him when he said he would stop using. Mother reported to the court-appointed guardian ad litem that later "CPS became involved and she realized he was still using methamphetamines and making [them] in the home, so she left and filed for divorce."  The guardian ad litem also reported that Mother "acknowledged that she knew he had dangerous chemicals in the home but thought 'he was just collecting them.'" Mother and Father's divorce was finalized in 2016.  Father was later diagnosed with cancer and died in late 2017.  Father's estate passed primarily through his revocable trust.  At his death, that trust continued as separate trusts for the benefit of each of the children.

abuse and neglect, Anne reported that when she was in trouble at home, Mother would kick her out of the house overnight as punishment and Anne would sleep in the yard.

The Department followed its standard procedure to investigate the report, which includes conducting a family-based assessment during which all members of the household are present. The Department's caseworker testified about that meeting and the Department's investigation, and the Department's reports were admitted into evidence. At that assessment meeting with Mother and the three children present, the Department learned that Zephyr had found Anne outside when she had fainted after she had been locked out as a form of punishment and that when Anne came to after Zephyr found her, she was covered with bugs.

At this meeting, Anne and the other children reported various forms of punishment and household conditions that the Department found inappropriate and concerning. The children reported that Mother told them that school was a privilege and that chores were more important than schoolwork. The Department's caseworker photographed a chart of the children's chores and consequences for failure to complete them that was introduced into evidence, and in addition, the caseworker testified to a more detailed two-page document behind the chart that provided more detail about chores and consequences. Specifically, the caseworker testified that if all chores were not completed by 7:00 p.m. each day, a child would be assigned a yard-work shift until the chores had been completed to Mother's satisfaction. The yard-work assignments had to be done immediately, and only after completion of yard work would the child be given the opportunity to finish the chores. If the chores were not finished before Mother was done for the night, the child was required to "camp" outside. If the child was not in bed on time, then the child was assigned "an equal amount of time of weeding the next day" regardless of

3

weather conditions. The children also were not allowed access to electronics until their chores were completed, even if they needed them for school.

The caseworker asked if she could interview the children separately, but Mother refused that request. Nevertheless, the children corroborated the details of this punishment structure during the family meeting. They reported being made to work outside during ice storms and a lightning storm. The children also informed the caseworker that Mother would lock the door and they were not allowed to come back inside to use the restroom when they were doing yard work. The children reported that they had to finish their assigned yard work even if it took all night. The children disputed Mother's statement that they had access to a tent whenever they were left outside, although they did stay in a tent after the recent ice storm. Mother told the caseworker that she "did not see anything wrong with how she punished the children."

The caseworker asked the family to tell her about their worries. Both Zephyr and Sam reported that they are worried about their own mental health. Zephyr reported having suicidal ideations every day and had a therapist who assessed Zephyr's mental health and suicidal ideations each week. Sam and Anne both reported being worried about Anne's health. Anne also reported being worried about passing ninth grade and what will happen to her siblings when she goes to college. Zephyr reported being worried about passing school and that chores would get worse. Mother reported that she was worried about Anne's health, about Anne's procrastinating, and about Sam's use of electronics and his addiction to them. Mother requested assistance from the Department with locating a psychiatrist for Zephyr.

The children also reported that all doors must be kept open and unlocked, even when they are using the bathroom, and that this rule sometimes caused problems with them walking in on each other in the bathroom. Zephyr stated that the children's bedroom doors had

4

been taken off the hinges and that Mother had only recently put them back on before the meeting with the caseworker. Sexual-abuse screening was conducted with all three children, and all three denied sexual abuse.

Mother left the room for a period of time during the meeting, and the caseworker testified (and stated in her report) that when Mother returned, she appeared visibly upset and began threatening the children with removal of privileges (including removing Anne from the private school she attended) and stating that they were ungrateful and taking advantage of her. The caseworker told Mother it was inappropriate to threaten the children for expressing their feelings and explained that "the punishments seemed a bit unusual and put the children in situations where they could be hurt," especially given Anne's serious medical condition. Before the caseworker left, she spoke with Mother outside and discussed with Mother her concerns about Mother's parenting and informed her about the next steps that the Department would be taking, including that the Department would request that Mother complete a mental-health evaluation. The caseworker also explained that school is a requirement by the State of Texas and suggested that Mother address her concerns about electronics by allowing the children to use them in her presence and possibly locking down the computer to only access certain things, but Mother stated she already tried that tactic and the children could bypass the restrictions. Mother agreed not to lock the children outside or force them to sleep outside and not to discipline them with outside punishment before 8:00 a.m. or after sunset.

At the end of May, the Department received a report that Anne had attempted suicide by overdosing on Benadryl and was hospitalized at a mental-health facility for ten days. It was reported that Mother had been verbally and emotionally abusive to Anne, that she would not allow Anne to do homework at home, and that she had locked Anne out of the home again.

Zephyr found Anne after she overdosed, and a neighbor called the ambulance. It was also reported that Anne did not want others to find out about her suicide attempt because she was worried about retribution by Mother.

The caseworker tried to set up another meeting with Mother to discuss the Department's concerns, but Mother was uncooperative about scheduling and eventually the caseworker had "to show up at her office to attempt to discuss with her the concerns of the Department." Mother did not undergo the mental-health evaluation requested by the Department, which the caseworker testified was requested because of "the lack of consideration that [Mother] was placing on the children's medical and mental health in regards to the punishment and consequences they were receiving — she lacked a lot of empathy towards the children regarding the consequences, and education." Mother was also uncooperative when the caseworker was attempting to meet Anne and locate her to assess her mental-health status, which was problematic because the Department requires that the caseworker see the children every 30 days. Mother also withdrew releases that she had previously signed authorizing the children's healthcare providers to share information with the Department, so the providers refused to speak with the caseworker.

**Grandfather becomes concerned for the children and files this SAPCR**

In the six months before the events that triggered the Department's involvement in May 2021, Grandfather had only limited contact with the children. He and his wife lived on a farm west of Houston at that time, and he had a law office in Houston.[4] During the six months

---

[4] Grandfather was 70 years old in May 2021, but he still had an active law practice. Mother is also an attorney.

before May 2021, Anne would call him once or twice a week. He would send letters and things to the other two children, but they were not reaching out to him. He would send Mother's Day gifts and flowers to Mother. He was planning to be in Austin in late May and tried to make plans to see Mother and the children, but Mother had cancelled the plans.

Grandfather testified that he received a call in May 2021 from the mother of one of Anne's friends, who accused Mother of child abuse. Grandfather had never met the caller and at first was skeptical of her. He explained to her that Mother was a single mother "and I tried to talk her down. I thought she was exaggerating." Soon after, however, he received another call from the same mother and learned that Anne had attempted suicide. Grandfather began by contacting Mother by email to find out what had happened, but Mother refused to share any useful information with him about Anne and how she was doing, other than stating that "she is safe and protected." After Grandfather learned of the Department's involvement, he went to the Department to ask for information. Although they could not give him information, a supervisor suggested to him that he should go over to Mother's house to check on Anne.[5] The Department also encouraged him to file suit and ask for custody of Anne.

---

[5] When Grandfather went to Mother's house, he was able to speak to Anne in the home for between half an hour and an hour before Mother came home and screamed at him and ordered him to leave. Grandfather called the police and asked for a welfare check because he was concerned for Anne's safety. The police officer who responded to the call testified at the temporary-orders hearing that he spoke with Anne alone and was concerned about the information Anne gave him about how Mother treated her, which was similar to the information already reported by the children to the Department. He separately encouraged both Mother and Grandfather to open up a dialogue with each other to mitigate any potential custody conflicts. The officer described Mother as being "exceptionally reluctant and did not want to have anything to do with – with her father." He described Grandfather as appearing "very, very willing to" open a dialogue with Mother and expressed that he "genuinely believe[d] that [Grandfather] wanted what was best for [Anne] and – and – and was trying to go about the best way to get that."

Grandfather filed his original SAPCR petition on July 6, 2021, and at first sought conservatorship of only Anne. At the time, he knew only of her suicide attempt, her punishment of being made to sleep outside, that Mother had not allowed her to take her final English exam (required to move up to tenth grade), and that Mother had temporarily withheld a COVID vaccine from Anne as a punishment. Once Grandfather learned that Sam and Zephyr had experienced similar issues with Mother, he amended his petition to seek conservatorship of all three children.

**Procedural history**

In early July 2021, the district court granted Grandfather a temporary restraining order giving him possession of the children. Mother filed a motion to strike Grandfather's SAPCR petition for lack of standing. After an associate judge conducted a temporary-orders hearing later in July, he signed temporary orders appointing Grandfather temporary sole managing conservator of all three children and appointed a guardian ad litem to be assigned by the Travis County Domestic Relations Office. The judge also denied Mother's motion to strike Grandfather's petition for lack of standing. The temporary orders gave Grandfather the exclusive right to designate the children's primary residence but provided that once the children's school started in August 2021 that primary residence was to be in Travis County and contiguous counties.[6] In addition, the temporary orders required that the children continue to

---

[6] Grandfather and his wife moved to Austin in August 2021 and bought a house to comply with the trial court's order that the children continue attending their same schools for the 2021-2022 school year.

8

attend the private schools that they were previously attending.[7]  The temporary orders suspended all possession of and access to the children by Mother until a change was made by recommendations of the guardian ad litem, further order of the court, or agreed to by the parties in writing.  All the children were ordered to participate in individual therapy.  Mother and the children were also ordered to participate in family therapy following the recommendations of the family therapist regarding frequency, duration, and who should attend each family session.  The temporary orders allowed the children to call Mother or otherwise contact her whenever the children wanted to, and the family therapist was in place if the children wanted to meet with Mother in person.  The orders further required psychological evaluation of Mother and all three children by a forensic psychologist.  Mother did not seek de novo review of the temporary orders by the district court.

The associate judge appointed Suzan Bayar as guardian ad litem for the children at the beginning of August 2021, and Bayar remained guardian ad litem through trial.  In October 2021, the associate judge issued an order requiring forensic psychological evaluations of Mother and all three children and appointed a forensic psychologist, Dr. Daphny Ainslie, to conduct those forensic psychological evaluations.  On December 1, 2021, the associate judge signed temporary orders requiring that Mother pay temporary child support of $1,418.00 per month; that

---

[7] The trial court later allowed some changes to the children's schools.  Anne remained at the same school in Austin for the 2022-2023 school year, but she changed from being a day student to a boarding student.  After he finished eighth grade at the end of the 2021-2022 school year, Sam changed to a school in Houston for the 2022-2023 school year, and he and Grandfather and Grandfather's wife moved back to Grandfather and his wife's home west of Houston.  Zephyr was hospitalized because of emotional issues soon after being placed with Grandfather and spent some time in different residential treatment facilities.  For the 2022-2023 school year, Zephyr attended a boarding school in Houston and returned to Grandfather's home during school breaks.  During this time frame, the three children would spend time together with Grandfather and his wife at that residence, even though Sam was the only one who lived there.

all funds paid by the Social Security Administration or any other governmental agency, life insurance policy, or trust for the benefit of the children should be redirected and made payable to Grandfather; and that Grandfather be the sole authorized recipient for any child support paid by Father's estate previously payable to Mother. These temporary orders also included requirements for medical-support payments. On March 9, 2022, the associate judge signed additional temporary orders, requiring Mother and Grandfather to participate in family therapy and denying Mother's motion for a psychological evaluation of Grandfather. In these temporary orders, the trial court provided that Mother could write letters to Anne and Sam, provided that those letters were first vetted by the family therapist before being sent to the children, and to Zephyr, provided that the letter was first vetted by Zephyr's treating therapist. The guardian ad litem noted in her report to the trial court that Mother wrote one letter to Sam, which he refused to read, and one to Anne, who felt the letter was hurtful. Zephyr may have received letters while at an out-of-state inpatient treatment facility that went through a therapist.

The district court conducted a bench trial from July 24 through August 4, 2023. The trial court heard testimony from the parties, the children, and many witnesses, including the children's therapists, the guardian ad litem, and the psychologist appointed by the court to conduct the forensic psychological evaluations of Mother and the children. Between July 2021 and the trial in August 2023, Mother did not have any visitation with Anne or Sam. Mother had supervised visitation with Zephyr during a parent-child weekend at an inpatient treatment facility where Zephyr was living during spring 2022 but refused to meet with Mother again after that meeting. The guardian ad litem stated in her report that "[a]ll the children have been clear that they do not want contact." The guardian ad litem further stated in her report that "[i]t is very concerning that [Mother] will say 'I made mistakes' but she will not talk about specific things

she did wrong and when questioned further she goes back to blaming [Grandfather] and [Anne] for [Mother's] current situation." In her testimony at trial, the guardian ad litem again expressed her concern that Mother continued to blame Grandfather and Anne for the current situation without acknowledging her specific mistakes or the impact that those mistakes had on the children. However, the guardian ad litem expressed that she would recommend that Mother begin to have contact with Sam and Zephyr through therapist-supervised phone calls and that in-person meetings should only happen when the therapists thought everyone was ready and that Anne, who was close to turning 18 years old, should be able to decide for herself about contacting Mother.[8] The guardian ad litem recommended that all three children should continue to reside with Grandfather and that he should be the decision-maker for them.

The trial court signed the final SAPCR order on October 30, 2023. Relevant to this appeal, the trial court ordered the following relief:

- Grandfather is appointed the sole managing conservator of all three children.

- Mother is appointed possessory conservator of all three children.

- Mother is granted possession as agreed by the conservators, and failing agreement:

  o Possession of Anne only upon Anne's request;

  o Possession of Sam and Zephyr for two hours on the first Sunday of each month, provided that either child may opt out of any scheduled visit; and

  o Visitation to be under supervision if recommended by a child's therapist or requested by the child.

- Electronic communication is allowed between the children and Mother at any time when initiated by the children.

---

[8] The guardian ad litem also testified that during the life of the case, there had been monthly team meetings with all of the providers on the case, so she knew "that these providers are very open to working with each other and to help formulate plans."

11

- Mother is granted the right to receive information about the health, education, and welfare of the children; the right to access their medical, dental, psychological, and educational records; the right to consult with the children's physicians, dentists, and psychologists; and the right to consult with school officials about the children.

- Mother is granted the right to confer with Grandfather to the extent possible about significant decisions concerning the health, education, and welfare of Sam and Zephyr.

- Grandfather is granted the exclusive right to consent to most decisions concerning the health, education, and welfare of the children.

- Mother is required to pay Grandfather child support of $1,418.00 per month.

- Mother is required to pay $591.53 per month as additional child support for the cost of health, dental, and vision insurance.

- Grandfather is awarded $515,253.07 in past attorney's fees (60% of his requested amount), plus appellate attorney's fees if Mother unsuccessfully appeals.

- The children are ordered to receive developmentally appropriate education from their therapists regarding Mother's mental health, with the content of the education to depend on whether Mother received further testing for autism.

The trial court subsequently signed findings of fact and conclusions of law. This appeal followed.

## ANALYSIS

On appeal, Mother challenges the trial court's final order in four issues. First, she asserts that the trial court erred by finding that Grandfather had legal standing to bring the SAPCR under Section 102.004(a)(1). Second, Mother contends that Grandfather failed to provide sufficient evidence to rebut the parental presumption created by Section 153.001 (sometimes described as the "fit-parent presumption"), which places the burden of proof on the nonparent seeking conservatorship to establish that the parent's appointment would result in significant impairment to the child. Third, Mother contends that the trial court abused its discretion in setting the terms of her possession and by requiring Mother to pay Grandfather

child support and attorneys' fees. Fourth, Mother argues that the trial court abused its discretion by ordering that she either undergo specific autism testing to confirm a diagnosis of autism within a specified time, or alternatively, that the children would "receive developmentally appropriate education" on the psychologist's diagnostic impressions of Mother as reported in the psychologist's forensic psychological evaluation.

In addition, while this appeal was pending, Mother filed another appeal and two mandamus petitions. In each of those proceedings, Mother has asserted that the trial court that heard Grandfather's SAPCR lacked jurisdiction because the case should have been filed in the 200th District Court of Travis County instead of the 53rd District Court of Travis County and that every order that has been issued in this case is therefore void. Because Mother challenges in this Court the trial court's subject-matter jurisdiction over the case underlying this appeal and asserts that the order appealed from is void, we consider the trial court's jurisdiction before addressing the issues Mother has raised in this appeal.

I.      **Jurisdictional Issues**

   A.      **The trial court's jurisdiction over this case**

Mother argues that this Court should declare void every order issued in Grandfather's SAPCR because the case should have been filed in the 200th District Court of Travis County instead of the 53rd District Court of Travis County. The 200th District Court issued Mother and Father's 2016 final divorce decree, which established conservatorship, possession, and support for the children.[9] Mother asserts that under Texas Family Code Section 155.001, the 200th District Court thus acquired continuing, exclusive jurisdiction over any

---

[9] We note that this decree was actually signed by the judge who presided over the 98th District Court.

SAPCR matters related to the children, and absent a valid transfer under Chapter 155, no other court may exercise jurisdiction over such matters. Thus, she argues, all orders issued after Grandfather's SAPCR was filed in the 53rd District Court are void. We disagree.

Travis County has long employed a central-docket system under which "hearings and trials are assigned to available judges without regard to the court in which the case is filed." Travis County Civ. Dist. Ct. Loc. R. 1.3. The Local Rules further provide

> Therefore, unless a case is specially assigned to a particular judge pursuant to Local Rule 2.6 or 10.2, each hearing or trial in a case may be heard by *any judge*. For all matters, therefore, the District Court number identified in the style of the case does *not* mean the judge of that court will conduct the hearings or trial.

*Id*. In accordance with this system, Local Rule 1.4 provides that notices of hearings and trials "must *not* direct the parties to the court listed in the case style (i.e., the number randomly assigned when the case was filed and listed at the top of each pleading)," but instead should direct parties to the Civil and Family Courts Facility generally. *Id.* R. 1.4.

"District courts are authorized to operate on central-docket systems."[10] *Walker v. Jenkins*, No. 03-18-00235-CV, 2018 WL 3059962, at *2 (Tex. App.—Austin June 21, 2018, no pet.) (mem. op.). The Texas Constitution authorizes district judges to "exchange districts, or hold courts for each other." Tex. Const. art. V, § 11. Texas Rule of Civil Procedure 3a allows district courts to make local rules, and the Travis County District Courts have adopted local rules allowing and governing the operation of its rotating central-docket system, *see* Travis Cnty. Dist. Ct. Loc. R. 1.2 (establishing three primary central dockets: Civil Docket, Family Docket, and

---

[10] We note that the Texas Supreme Court has proposed and preliminarily approved rule changes that may change the use of the central-docket system in Travis County, but those rule changes have not taken effect as of the date of this opinion.

14

CPS Docket), 1.3 (allowing any district judge to preside over hearing or trial in any case, unless case has been specially assigned to particular judge under local rules); 21.1-22.6 (establishing rules for setting cases on Family and CPS dockets and authorizing associate judges to hear all matters relating to suits over which district courts have jurisdiction under Texas Family Code Title 1, Chapter 45; Title 4; and Title 5). This central-docket system, which allows for any available judge to hear a matter is "consistent with the concept of judges exchanging benches," and does not conflict with the requirements of Family Code Section 155.001. *See In re Garza*, 981 S.W.2d 438, 441 (Tex. App.—San Antonio 1998, orig. proceeding). Once continuing exclusive jurisdiction has been established in a particular district court in Travis County, under the operation of the Travis County Local Rules, any district judge in the county acting in that case is doing so for the court with continuing exclusive jurisdiction. *See id.* at 441-42. Accordingly, we hold that the orders issued in this SAPCR are not void for lack of jurisdiction.[11]

B.     **Grandfather's standing to bring the SAPCR**

In her first issue, Mother contends that the trial court erred at the beginning of the case by concluding that Grandfather had standing to seek conservatorship of the children under Family Code Section 102.004(a)(1). Grandfather responds that Mother's challenge to his standing fails for two independent reasons: (1) Mother failed to create a complete appellate record of the evidence considered by the trial court because she did not request that a record be made of the children's in camera interviews with the trial court, and thus, we must presume that

---

[11]   To the extent that Mother contends that Grandfather should have filed a modification proceeding in the divorce case in the 200th Travis County District Court instead of an original proceeding in a different Travis County District Court, we disagree. The Family Code allows Grandfather to file an original suit. Section 102.004(a) allows him to file an original suit requesting managing conservatorship if he proves the order is necessary under subsection (1).

those interviews are relevant and support the judgment; and (2) sufficient record evidence supports the trial court's conclusion that Grandfather had standing.

Mother filed a motion to strike Grandfather's petition for lack of standing soon after Grandfather filed his petition. The trial court heard the motion at the same time that it heard Grandfather's request for temporary orders. In the temporary orders, the trial court denied Mother's motion to strike and stated its finding that "based on the evidence presented including the conferences with the children, the requirements under Texas Family Code § 102.004 have clearly been met, and [Grandfather] has standing to bring this suit."

Standing is a threshold requirement for subject-matter jurisdiction and a constitutional prerequisite to maintaining a lawsuit. *See, e.g.*, *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 443-44 (Tex. 1993); *Jasek v. Texas Dep't of Fam. & Protective Servs.*, 348 S.W.3d 523, 527 (Tex. App.—Austin 2011, no pet.). Whether a party has standing to pursue a cause of action is a claim that we review de novo. *Mauldin v. Clements*, 428 S.W.3d 247, 262 (Tex. App.—Houston [1st Dist.] 2014, no pet.). When, as here, the trial court does not make separate findings of fact and conclusions of law about standing, we imply the findings necessary to support the trial court's legal conclusion that Grandfather had standing, subject to challenge for legal or factual insufficiency of the evidence supporting them. *Medrano v. Zapata*, No. 03-12-00131-CV, 2013 WL 6921500, at *5 (Tex. App.—Austin Dec. 31, 2013, no pet.) (mem. op.). We thus review the evidence in a light favorable to the trial court's findings, drawing reasonable inferences in their favor, and presuming that the court resolved any evidentiary conflicts in a manner supporting its implied findings. *Id.* at *8 (quoting *City of Keller v. Wilson,* 168 S.W.3d 802, 819 (Tex. 2005) ("[T]rial-level fact-finders 'are the sole judges of the credibility of the witnesses and the weight to give their testimony. They may

16

choose to believe one witness and disbelieve another. Reviewing courts cannot impose their own opinions to the contrary.'"")).

When analyzing standing, we consider the plaintiff's live pleadings and the relevant jurisdictional evidence presented by the parties. *See Jasek*, 348 S.W.3d at 527-28 (citing *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225-26 (Tex. 2004); *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000)). Here, because the Texas Family Code provides a comprehensive statutory framework for standing in SAPCRs, "[t]he party seeking relief must allege and establish standing within the parameters of the language used in the statute." *In re H.G.*, 267 S.W.3d 120, 124 (Tex. App.—San Antonio 2008, pet. denied).

In particular, the Texas Family Code establishes who has standing to file an original suit in a SAPCR. *See generally* Tex. Fam. Code §§ 102.003-.007. Specifically, a grandparent "may file an original suit requesting managing conservatorship if there is satisfactory proof to the court that . . . the order requested is necessary because the child's present circumstances would significantly impair the child's physical health or emotional development." *Id.* § 102.004(a)(1). The party asserting standing bears the burden of establishing his standing within the parameters of that statutory language. *See Medrano*, 2013 WL 6921500, at *5; *see also In re S.M.D.*, 329 S.W.3d 8, 13 (Tex. App.—San Antonio 2010, pet. dism'd).

"Satisfactory proof to the court," as used in Section 102.004(a)(1), denotes proof by a preponderance of the evidence. *See, e.g.*, *Medrano*, 2013 WL 6921500, at *7; *In re S.M.D.*, 329 S.W.3d at 13. "Present circumstances" refers to the circumstances in existence when Grandfather filed his suit requesting managing conservatorship. *See Medrano*, 2013 WL 6921500, at *7. In other words, the party seeking conservatorship must show, by a preponderance of the evidence, facts establishing that standing existed at the time suit was filed

in the trial court, and if he cannot, the trial court must dismiss the suit. *See, e.g.*, *In re S.M.D.*, 329 S.W.3d at 13.

The thrust of Mother's appellate argument is that the evidence was legally insufficient to support the implied finding that the children's "present circumstances" as of July 9, 2021, would more likely than not "significantly impair" either their "physical health" or "emotional development." Rather than disputing the evidence of the events that led to the Department's involvement with the children and the evidence that the Department uncovered during its investigation of Mother's discipline of and relationship with the children—including Anne's recent suicide attempt—Mother focuses on disputing whether a reasonable factfinder could find that the circumstances present at the time Grandfather's suit was filed would significantly impair the children's physical health or emotional development.

Mother contends that Grandfather "failed to show a specific, identifiable behavior or conduct of [Mother] that would probably cause significant impairment, and that the children were in danger as of the time of the hearing." She argues that her parenting decisions "either did not rise to the level of imminent physical or emotional harm, or they were corrected before [Grandfather] even filed suit." We disagree.

The record reflects that at the time Grandfather filed his petition, the Department was investigating the allegations against Mother about her discipline of the children. The Department's caseworker testified at the hearing that she concluded that "the children were being kept outside of the home for long periods of time and made to sleep outside." This conclusion was supported by Mother's consequences chart, which included a statement that "[i]f responsibilities are not completed before mom is done for the night, then you will camp outside." Although Mother claimed that there was a tent in a shed near the house, the children said that

18

they did not always have access to the tent. In addition, Anne had reported to the caseworker being punished when she once tried to sleep in Mother's car rather than outside, and Zephyr reported that she was disciplined by Mother for sneaking blankets and pillows out to Anne. The caseworker testified that Mother "did not consider the weather conditions whenever conducting outdoor punishment." Zephyr reported that the children were required to be outside during extreme weather conditions, including an ice storm. Mother's consequences list also supported this conclusion. The list stated: "If you are not in bed on time, then you will have an equal amount of weeding the next day. This is not pleasant, as it can be cold, hot, late, and surrounded by mosquitos." The caseworker testified that Mother's punishment of the children with outdoor chores "could go on all hours through the night, including overnights" and "during the week, when school was in session." The consequences chart also stated that "chores must be completed before school, tutoring, and scouts" in line with Mother's statement to the children that school was a privilege, not a necessity. The caseworker saw a note from Anne on the chores board that stated, "Mom, passed out outside. Hit my head. Wrote it down. . . . Going to bed. Will do an hour tomorrow to make up for it."

When asked by the trial court whether these allegations of outside discipline, including spending the night outside, if true, would rise to the level of abuse as far as the Department was concerned, the caseworker testified that they would. She further testified that the Department had not found any evidence that would controvert any of the statements that the children had made. The caseworker also testified that Mother had become uncooperative about scheduling required follow-up visits with the children in June to the point that the caseworker had to make an unannounced visit to Mother's office. In addition, during this visit, the caseworker saw Anne, and Anne reported to her that while Anne was asleep on the floor, Mother

19

grabbed Anne's arm and yanked it behind Anne's back hard enough that Mother had to pop Anne's shoulder back into place.[12]

The trial court also heard testimony at this hearing from the Austin Police Department officer, Officer Robert Brady, who had responded to Grandfather's call in June 2021 for a welfare check on Anne. He understood that Grandfather had been brought into the situation by the neighbors who were concerned for Anne after her suicide attempt. Officer Brady noted that "enough was going on in this household that it scared – it worried them enough about Anne's well-being that they sought out another family member to bring into this situation." When Officer Brady arrived, he first spoke with Mother, but when she left the room briefly, Anne requested to speak to him alone. Officer Brady described the things she said to him as "very disconcerting," and he stated that "[s]he directly linked her current mental health anguish to how her mother treats her," including periodically waking her up in the middle of the night, "screaming at her for some chores that she didn't accomplish," such as cleaning the house. Anne also told Officer Brady that she had "been punished by her mother by not letting her go to school and she's been punished by being kicked out of the home." Anne was very concerned about telling him that information because "[s]he was worried about retaliation."

Grandfather testified that Anne's friend's mother contacted him twice, stating that when she contacted him the second time, after Anne's suicide attempt, she was upset that he had initially defended Mother and had not taken action, and then Anne ended up in the hospital. She told him Anne was a child who needed to be protected and was in grave danger, which led to his reaching out first to Mother, then to the Department, and then going to Mother's house to try to

---

[12] Mother testified that she recalled waking Anne up off the floor to get her to sleep in her bed but that she did not pull her arm and that Anne's shoulder was not hurt.

20

see Anne. He testified that all three children were sleep-deprived and seemed traumatized when he picked them up and that Zephyr was underweight and suffering from a bronchial illness that had not been treated.

While Sam and Zephyr's school principal and the children's nanny both testified that they had never seen Mother act in a way that caused them concern for the children's safety, the nanny testified that she was aware that Mother sometimes made the children sleep outside as a punishment, which the nanny was "very uncomfortable with" and did not agree with as a punishment, finding it "insane."[13] The nanny also acknowledged that the consequences related to the children's electronics were "very hard" to administer because their school was based on the electronics, so if they were unable to use them, sometimes it would affect the children's being able to go to school or do homework.

Mother testified that she realized Anne was in crisis when Anne had to go to the emergency room because she attempted suicide. She followed the recommendation to put Anne into an inpatient treatment program at a mental-health hospital. Mother testified that Anne's therapist had recommended that Anne work with a therapist with a background in eating disorders. Mother admitted that she had been preventing Anne from taking her 9th grade English final and that she had taken Anne's laptop and was unable to find it.

In addition to all this evidence, the trial court conferred with each of the children in chambers, as permitted by the Family Code. *See* Tex. Fam. Code § 153.009(a). Mother did

---

[13] The nanny testified that her interactions with Mother were primarily daily text or telephone conversations in which Mother would update the nanny on what had happened the previous night after the nanny left to keep them on the same page "as far as what the goals and expectations were" for the day. Beginning in the pandemic, the nanny would be there with the children three to five days a week. She testified she did not observe Mother with the children on a daily basis, but she would probably see her in person at least three days of the week, for a total of one-and-a-half to two hours per week.

21

not request that a record be made of these interviews. *See id.* § 153.0009(f) (allowing party to move for record to be made of interview of children age 12 or older and establishing that interview record "shall be part of the record in the case"). When ruling at the conclusion of the hearing that Grandfather had standing to seek conservatorship of the children, the trial court stated that its decision was supported by the children's testimony in chambers:

> With regard to [Mother's] motion to strike the petition based on the issue of standing, that's denied. I think the evidence that I heard, *including conferring with the children*, that the evidence that I heard clearly meets the standard to allow [Grandfather] to have the hearing.
>
> I am extremely concerned with regard to the mental health of all three children. *And I may be privy to more information, perhaps, than everyone, given that I conferred with the children*, or y'all may have the same information and I just don't know it. But I can tell you that I am extremely concerned with regard to all three children's mental health for different reasons.
>
> As was clear on the record, I did grant the motion to confer, and I did confer with all three children individually. I did so privately. I don't have any concerns that the children were not given privacy or that they were under any sort of pressure or any – or coached in any way. I do believe that the children were all candid when they spoke to me.
>
> So I am taking into consideration all of the evidence I heard, *including the information that I got from the children when I conferred with them in making these orders*. And I do believe that these orders are in the best interests of the children.

(Emphases added.) In addition, the court advised Mother and Grandfather at the end of the hearing that in its opinion if

> repair of the relationship with the kids and mom, especially [Anne], if those repairs are not made or not made in earnest, [Mother], I think that you're going to have an irreparably damaged relationship with your children, if those relationships are not already irreparably damaged.
>
> . . . .

22

[Y]ou can think that I don't know what I'm talking about, but I just heard some evidence and I took -- talked with the kids, and who knows what they told me, but I'm telling you this is -- this is very serious.

. . . .

These kids -- these kids are in free fall. These kids need a lot of help to get them back on their feet, and continued animosity between y'all is not going to help them. And if I can't count on y'all to keep these kids safe, there's always foster -- the foster system. And don't think that that's not an option that's on the table. I can tell you *I'm very concerned about the kids after speaking to them*.

(Emphasis added).

While Mother argues that whatever the children said to the trial court in chambers would have been substantially the same as what they reported to the Department's caseworker, we cannot make such an assumption. Instead, we conclude that the interviews of Anne and Sam, who were both over the age of twelve when interviewed, constitute evidence for the purposes of the missing-records presumption, meaning that we must presume that those interviews contained sufficient evidence to support the trial court's finding that Grandfather had standing. *See, e.g.*, *In re C.J.*, 689 S.W.3d 417, 422-23 (Tex. App.—Dallas 2024, no pet.) (analyzing Section 153.009, recent Texas Supreme Court authority, and cases from various courts of appeals and concluding that Section 153.009 interviews with children at least 12 years old constitute evidence and party's failure to bring forward interview record triggers missing-record presumption).

Although Mother argues that Grandfather's testimony was "a series of melodramatic untruths and hearsay accusations" that were unconfirmed by the nanny and Sam and Zephyr's school principal, and that the Department did not believe that the accusations were serious enough to warrant an emergency removal of the children from the home, these arguments

23

ultimately assail the trial court's assessments of the credibility of the various witnesses, including the children, and the weight to be given their testimony. *See Medrano*, 2013 WL 6921500, at *8. The trial court impliedly credited the children's and other witnesses' version of the events instead of Mother's, and "it is a fundamental limitation on our power that we must defer to such assessments by a fact-finder." *Id.*

Furthermore, the evidence from the witnesses other than the children, standing alone, when viewed in the light most favorable to the trial court's findings, supports a conclusion that Mother had engaged in recurrent abusive disciplinary behavior toward the children that had increased during the time period immediately preceding Grandfather's filing of suit. The evidence also supported a conclusion that these episodes and the children's perception that they would continue to occur had given rise to ongoing emotional distress with physical manifestations, including Anne's suicide attempt, her possible eating disorder, and the children's sleep-deprived and traumatized appearance. *See id.* at *8 & n.17 (noting, when considering evidence of significant impairment for grandparent standing, that child's physical manifestations of emotional distress, including stress-induced vomiting, sleeplessness, crying episodes, and fear, resembled proof that suffices to establish compensable mental anguish because they were evidence of "a substantial disruption in the plaintiff's daily routine" or other evidence of "high degree of mental pain and distress" that is more than mere worry, anxiety, vexation, embarrassment, or anger). A reasonable factfinder could also infer that Mother's behavior, and its accompanying effects on the children, would continue to occur while the children lived with her. *See In re K.J.*, 676 S.W.3d 186, 191 (Tex. App.—Tyler 2023, no pet.) ("The evidence must support a logical inference that the specific, identifiable behavior or conduct will probably result in the child being emotionally impaired or physically harmed, and evidence that merely raises a

24

surmise or speculation of possible harm is insufficient to establish that inference."). Under the standard of review that requires us to presume reasonable inferences and a resolution of evidentiary conflicts in favor of standing, we are compelled to conclude that the totality of evidence is sufficient to enable a reasonable factfinder to determine that the children's circumstances when Grandfather filed suit would significantly impair at least their emotional development, if not also their physical health. *See id.* at *9. This implied finding in turn establishes Grandfather's standing to bring his suit. Therefore, we hold that the trial court correctly determined that Grandfather has standing under Section 102.004(a)(1). We overrule Mother's first issue.

## II. Merits Issues

The remaining issues that Mother raises are related to the merits of the trial court's order. In her second issue, she challenges the trial court's award of sole managing conservatorship to Grandfather because she asserts that Grandfather did not rebut the fit-parent presumption. In her third issue, she argues that the trial court abused its discretion when setting the terms of her possession, requiring her to pay child support to Grandfather, and awarding attorneys' fees to Grandfather. In her fourth issue, she contends that the trial court abused its discretion by ordering that the children receive counseling about Mother's mental health.

We review the trial court's decisions about conservatorship, possession and access, child support, attorneys' fees, and therapy for the children for an abuse of discretion. *See Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982) (reviewing trial court's appointment of father as managing conservator); *Iliff v. Iliff*, 339 S.W.3d 74, 78 (Tex. 2011) (reviewing child support); *Coburn v. Moreland*, 433 S.W.3d 809, 823 (Tex. App.—Austin 2014, no pet.)

25

(reviewing terms of possession and access and attorneys' fees). "A trial court's determination of what is in the child's best interest, specifically the establishment of terms and conditions of conservatorship, is a discretionary function." *In re J.J.R.S.*, 627 S.W.3d 211, 218 (Tex. 2021). "The trial court's judgment will be reversed only when it appears from the record as a whole that the court has abused its discretion." *Gillespie*, 644 S.W.2d at 451. A trial court abuses its discretion if it acts "without reference to any guiding rules or principles," or in other words, if it acts in an arbitrary or unreasonable manner. *In re J.J.R.S.*, 627 S.W.3d at 218 (quoting *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam)).

"The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." Tex. Fam. Code § 153.002. Rulings on conservatorship and possession issues are "intensely fact driven." *Lenz v. Lenz*, 79 S.W.3d 10, 19 (Tex. 2002). Accordingly, "[t]he trial court is in the best position to observe the demeanor and personalities of the witnesses and can 'feel' the forces, powers, and influences that cannot be discerned by merely reading the record." *Echols v. Olivarez*, 85 S.W.3d 475, 477 (Tex. App.—Austin 2002, no pet.).

In family-law cases, the abuse-of-discretion standard overlaps with traditional standards for reviewing the sufficiency of the evidence. *See Zeifman v. Michels*, 212 S.W.3d 582, 587-88 (Tex. App.—Austin 2006, pet. denied). Consequently, legal and factual insufficiency are not independent grounds of error but are relevant factors in assessing whether the trial court abused its discretion. *Id.* at 587. To determine whether the trial court has abused its discretion, we engage in a two-pronged inquiry, analyzing whether (1) the trial court had sufficient evidence upon which to exercise its discretion and (2) the trial court erred in its

application of that discretion. *Id.* at 588. Traditional standards for legal- and factual-sufficiency review come into play with regard to the first question. *Id.*

Under the legal-sufficiency standard, when the appellant attacks the legal sufficiency of an adverse finding on which she did not have the burden of proof, she must demonstrate on appeal that there is no evidence to support the adverse finding. *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 215 (Tex. 2011). We credit all evidence and inferences favorable to the trial court's decision if a reasonable factfinder could, and we disregard all evidence to the contrary unless a reasonable factfinder could not. *City of Keller*, 168 S.W.3d at 827. Evidence is legally sufficient if it "would enable reasonable and fair-minded people to reach the verdict under review." *Id.* Evidence is legally insufficient when (1) there is a complete absence of a vital fact; (2) rules of law or evidence preclude giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact. *See id.* at 810, 815-16. Under the factual-sufficiency standard, when the appellant attacks the factual sufficiency of an adverse finding on which she did not have the burden of proof, we consider and weigh all the evidence in the record pertinent to the finding to determine if the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the finding should be set aside. *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 615 (Tex. 2016).

Because the trial court acts as the factfinder in a bench trial, the trial court is the "sole judge of the credibility of the witnesses and the weight to be given their testimony." *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986). The trial court does not abuse its discretion if it bases its decision on conflicting evidence or when evidence of a probative or

27

substantive character exists to support the decision. *Zeifman*, 212 S.W.3d at 587. "The mere fact that a trial court decided an issue in a manner differently than an appellate court would under similar circumstances does not establish an abuse of discretion." *Id.* With this standard of review in mind, we turn to Mother's challenges to the merits of the trial court's final SAPCR order.

### A. The parental presumption and the award of sole managing conservatorship to Grandfather

In her second issue, Mother contends that Grandfather did not overcome the rebuttable statutory presumption that a parent should be named managing conservator of their children. *See* Tex. Fam. Code § 153.131(b) (creating rebuttable presumption that appointing parent as managing conservator is in child's best interest). In essence, Mother argues that the trial court abused its discretion by appointing Grandfather as sole managing conservator. The Family Code sets out "a series of directives" that the trial court must follow when determining conservatorship and the level of a parent's possession and access. *In re J.J.R.S.*, 627 S.W.3d at 218.

The Family Code provides that a parent or the parents shall be appointed managing conservator unless the court finds that appointment "would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development." Tex. Fam. Code § 153.131(a). The statute establishes a parental preference by placing the burden on the nonparent seeking conservatorship to establish that the parent's appointment would result in significant impairment to the child. *In re F.E.N.*, 579 S.W.3d 74, 76-77 (Tex. 2019) (per curiam). A parent who is not appointed managing conservator "shall" be appointed possessory conservator, "unless [the court] finds that the

28

appointment is not in the best interest of the child and that parental possession or access would endanger the physical or emotional welfare of the child." Tex. Fam. Code § 153.191. "A court, based on these parameters, must then determine the conservators' appropriate level of possession and access." *In re J.J.R.S.*, 627 S.W.3d at 218.

The nonparent has the burden to rebut the parental presumption by a preponderance of the evidence. *V.M. v. Texas Dep't of Fam. & Protective Servs.*, 681 S.W.3d 465, 473 (Tex. App.—Austin 2023, no pet.); *see also* Tex. Fam. Code § 105.005 (requiring generally that findings be based on preponderance of evidence). To rebut the parental presumption, the nonparent seeking conservatorship must identify "some act or omission committed by [the parent] which demonstrates that naming her as managing conservator will significantly impair [the child's] physical health or emotional development." *Lewelling v. Lewelling*, 796 S.W.2d 164, 168 (Tex. 1990); *see also In re F.E.N.*, 579 S.W.3d at 77 n.5 (noting that in *Lewelling* supreme court "did not address whether the parent's conduct must be of a certain type or nature"); *but see also In re R.T.K.*, 324 S.W.3d 896, 902 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (noting that Section 153.131(a) on its face "addresses only the *effect* of a parent's appointment on the child, as opposed to the myriad of circumstances—such as the parent's conduct—that might have *produced* that result").

The evidence of the parent's acts or omissions must raise more than "mere suspicion or speculation of possible harm." *J.H. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00162-CV, 2021 WL 2834719, at *4 (Tex. App.—Austin July 8, 2021, no pet.) (mem. op.). Types of parental conduct that may constitute significant impairment include (but are not limited to) physical abuse, severe neglect, drug or alcohol abuse, abandonment, bad judgment, or a history of mental disorders. *Id.* While a factfinder may infer present unfitness from recent,

29

deliberate past misconduct, evidence of past conduct alone may not be sufficient to show present unfitness. *V.M.*, 681 S.W.3d at 473. The factfinder should consider the parent's present conduct. *Id.*

Here, the trial court specifically found that the presumption that Mother is a fit parent had been overcome and that Mother's appointment as sole managing conservator would significantly impair the children's physical health or emotional development and would not be in their best interest. Grandfather introduced a substantial amount of "evidence of a substantive and probative character" at trial that supports the trial court's decision. *See Zeifman*, 212 S.W.3d at 587.

The evidence detailed above that supported Grandfather's standing to seek conservatorship is also relevant to the trial court's determination that he overcame the parental presumption because the evidence at trial showed that Mother's behavior that led to Grandfather's filing suit (and her other behavior that came to light later), which had significantly impaired the children's physical health or emotional development, was still affecting them at the time of trial. The guardian ad litem, the children's therapists, and the court-appointed psychologist all offered evidence reiterating the events described above in the context of offering evidence supporting a conclusion that the harm would continue if the children were returned to Mother's care.

The evidence that Mother punished the children by requiring them to do yardwork for long hours and late into the night, including on school nights and during unsafe weather conditions (including a lightning storm), and by making them sleep outside overnight without shelter, bedding, or access to bathrooms, including after an ice storm, was introduced at trial. In addition, there was evidence that she left them without food or transportation to and from school

30

on a number of occasions; if they did not make their own lunch or get to the bus on time, they were left without food or a ride. The court-appointed psychologist noted in her report that sources from Sam and Zephyr's school had reported that the children would often not have a lunch or ride and that providing those things for them had become a "community thing for all of the teachers in the last five to six years." The evidence about Mother taking away electronics needed for school as a punishment was also introduced at trial.

There was additional evidence introduced that Mother was verbally and emotionally abusive to the children and that she would pick sides and play favorites and would pit the children against each other. All three children reported that Mother's moods were unpredictable and volatile and her temper was explosive. The children also reported that she would threaten them with consequences when they reached out to third parties for help.

As a result of their treatment by Mother, at the beginning of the case, all three children were suffering from serious mental-health issues that came to light both through the Department's investigation and the reports of other mental-health professionals. In addition to Anne's suicide attempt, Sam and Zephyr were having suicidal thoughts. All three had been on medication for anxiety. Sam had previously been sent to a treatment camp because he was overusing electronics as a means of distraction from his anxiety and anger. Zephyr had a history of self-harming by cutting and ultimately went into an inpatient mental-health treatment facility.

While there was some dispute among the experts about what the precise causes of Mother's behavior are, the experts agreed that Mother was not well and was struggling with her mental health. The expert psychiatrist who testified for Mother at trial diagnosed Mother with autism spectrum disorder and PTSD. Mother's long-time therapist had diagnosed her with an adjustment disorder. The court-appointed psychologist summarized her diagnostic impressions

31

of Mother as having an unspecified personality disorder with borderline dependent traits, as well as PTSD and attention deficit hyperactivity disorder, combined presentation. The experts identified a number of traits that they observed in Mother: "instability"; "deficits in communication"; "sensory issues"; "notable anxiety"; "depressive symptoms"; "persistent distorted cognitions"; "irritability, angry outbursts"; "exaggerated startle response"; "problems with concentration"; and "difficulty managing and controlling her irritability and anger." Mother's expert testified that Mother would need to see a psychiatrist "very regularly, for an indefinite amount of time." The court-appointed psychologist recommended that Mother undergo inpatient psychiatric services, long-term weekly psychotherapy, and mood-stabilizing medication. The court-appointed psychologist recommended inpatient treatment at one of two different facilities, both of which have programs "for doctors, lawyers, physicians, you know, people, who, in various parts of their lives, are very high functioning [but] that are struggling in some areas."[14]

The trial court also heard evidence that Mother did not take responsibility for her actions toward the children. According to the court-appointed psychologist's report, Mother maintained that the punishment of sleeping outdoors was "camping" and "that this method of discipline was reasonable and appropriate." She believed that many of her punishments for the children were appropriate "natural consequences." Mother expressed her opinion to both the guardian ad litem and the court-appointed psychologist that Grandfather was engaging in parental alienation. The guardian ad litem testified that Mother "has been very focused on

---

[14] The court-appointed psychologist noted that these inpatient facilities also have treatment for personality disorders and clarified that while she had not diagnosed Mother with borderline personality disorder, she did think it was her "duty, in part, to describe the behaviors and characteristics that have been seen with [Mother]."

blaming [Grandfather] and [Anne] for the current situation. She'll make statements about how, you know she has made mistakes but not necessarily acknowledging those mistakes, or the impact that they have had on the children."[15] Mother did not follow the court-appointed psychologist's recommendations that she get inpatient treatment and parent education or the guardian ad litem's recommendation that she find a new therapist who would not enable her mistreatment of the children.

Mother was also not fully compliant with her obligations to work with various treatment providers and with Grandfather during the course of the litigation. She did not answer all the questions on the court-ordered psychological tests. She told her therapist to ignore a subpoena for production of records. In the opinion of a family therapist who met with both Mother and Grandfather, co-parenting by the two of them was not feasible. Mother was described as "entrenched" and engaged in "pointless power struggles" with Grandfather.

The trial court also heard from all three of the children's therapists. All three therapists reported improvement in the children's mental health after being removed from Mother's care. Anne's therapist reported that Anne "has been thriving when she does not have to go back to her tenuous relationship with her mother" and that she would resent court-ordered contact with her mother. Sam's therapist stated that in his opinion if Sam were returned to Mother, the problems Sam had before (depression, anxiety, and relational problems) would return. Zephyr's therapist testified that Zephyr, who is at a boarding school, had recently tried talking on the phone with Mother (with the therapist's participation), and the calls were harmful for Zephyr. Mother would dismiss Zephyr's feelings, and at the end of their last call, Zephyr

---

[15] The guardian ad litem further testified that in her opinion parental alienation by Grandfather was not a concern after she explored that possibility with the various mental-health professionals.

was shaking and curled up in a ball on the floor. The therapist explained that after that call Zephyr told the therapist that Zephyr does not sense that Mother has changed in terms of accepting and acknowledging the impact of her action. The therapist did not believe that Zephyr was "alienated" from Mother, but going forward Zephyr only wanted to have calls with Mother at Zephyr's own discretion. All three children expressed to their therapists and to the trial court in their separate in camera interviews their desire to continue being under Grandfather's care, while finding a way to eventually rebuild their relationships with their mother.[16] The trial court stated after the interviews that the children were not sure of the timing of rebuilding their relationships with Mother because they were still working on themselves and also they wanted to see that Mother had changed.

Contrary to what Mother argues, the trial court did not rely solely on the diagnoses of Mother's serious mental-health issues to support its determination that Mother's appointment as sole managing conservator would significantly impair the children's physical health or emotional development and would not be in their best interest. Instead, as required by the statute, its focus was on the effect of Mother's acts and omissions on the children. The trial court heard ample evidence of a probative or substantive character of Mother's specific acts and omissions that demonstrate that awarding custody to her would significantly impair the children's physical health or emotional development, and the trial court did not abuse its

---

[16] Unlike the temporary-orders hearing, a record was made of the in camera interviews with the children at the trial.

discretion by finding that Grandfather rebutted the parental presumption.[17]  We overrule

Mother's second issue.

       **B.**      **The trial court's orders on terms of possession, child support, and attorneys' fees**

In her third issue, Mother challenges three aspects of the trial court's final SAPCR order: (1) the terms of her possession of and access to the children, (2) the requirement that she pay Grandfather child support, and (3) the award of attorneys' fees to Grandfather.

       **1.**      **Possession**

Mother asserts that the trial court abused its discretion by imposing restrictions on her possession and access that exceed what is necessary to protect the best interest of the children.  *See* Tex. Fam. Code § 153.193 (prohibiting restrictions on possession that "exceed those that are required to protect the best interest of the child").  The trial court appointed Mother possessory conservator of the children.  In its final order, the trial court found that Mother's possession "should vary from the standard possession order because the children's physical health and emotional development would be significantly impaired under the standard possession order due to the length of unsupervised, overnight contact provided for in the standard possession order."  *See id.* § 153.256 (establishing factors that trial court may consider when ordering terms of possession other than standard possession order).  In addition, in its findings of fact and conclusions of law, the trial court expressly found that "[d]eviation from the Standard

---

[17]  We note that Anne turned 18 shortly after the trial court's order was entered, and she graduated from high school in May 2024.  Accordingly, the issues raised by Mother related to conservatorship and possession of Anne are moot because she is no longer a minor.  *See Medrano v. Zapata*, No. 03-12-00131-CV, 2013 WL 6921500, at *4 (Tex. App.—Austin Dec. 31, 2013, no pet.) (mem. op.).

Possession Order is in the best interest of the children" and that Mother's possession periods should vary from the standard possession order for the following reasons:

(a) The children's physical health and emotional development would be significantly impaired under the Standard Possession Order;

(b) The length of unsupervised, overnight contact provided for in the Standard Possession Order is not in the best interest of the children;

(c) [Mother] has not adequately cared for the children;

(d) [Mother] committed acts and omissions that have significantly impaired the children's physical health or emotional development.

The terms of Mother's possession provide that Mother is granted possession as agreed by the conservators, or failing agreement, possession of Sam and Zephyr on the first Sunday of each month for two hours. Sam and Zephyr are allowed to opt out of attending any scheduled visitation. Upon the children's therapists' recommendation or the children's request, supervision of the visits "shall be required." The children are also allowed to initiate contact with Mother at any time.

The order provides that Mother also has the right to confer with Grandfather via email about decisions affecting the health, education, and welfare of Sam and Zephyr, as well as the right to attend school activities of Sam and Zephyr with the children's written consent. *See id.* § 153.073 (establishing rights of parent appointed as conservator but providing that those rights may be limited by court order). Mother also has rights to receive information about all three children, to access their medical and educational records, and to consult with their healthcare providers and school officials. *See id.*

When a parent has been named possessory conservator, there is a rebuttable presumption that the standard possession order provides the reasonable minimum level of possession and is in the best interest of the child. *Id.* § 153.252. When deviating from the standard possession order, the court may consider "(1) the age, developmental status, circumstances, needs, and best interest of the child; (2) the circumstances of the managing conservator and of the parent named as a possessory conservator; and (3) any other relevant factor." *Id.* § 153.256. As noted above, the terms of an order that deviates from the standard possession order—that is, an order that "imposes restrictions or limitations on a parent's right to possession of or access to a child"—"may not exceed those that are required to protect the best interest of the child." *Id.* § 153.193. In addition to specifying the rights and duties of the possessory conservator, the trial court must "specify and expressly state in the order the times and conditions for possession of or access to the child, *unless* a party shows good cause why specific orders would not be in the best interest of the child." *Id.* § 153.006(c) (emphasis added).

Here, the trial court's order expressly states that possession is to be as agreed by the conservators, but failing agreement, it provides specific times and conditions for Mother's possession of Sam and Zephyr. However, it also allows the children to opt out of any scheduled visitation. Nonspecific orders issued under Section 153.006(c) may vary, based on the needs of the case, in terms of the level of specificity provided by the trial court and the amount of discretion left to the parties. *See In re J.J.R.S.*, 627 S.W.3d at 219 (citing Tex. Fam. Code § 153.193). The Texas Supreme Court held in *In re J.J.R.S.* that this type of nonspecific order— an "as agreed" visitation order—is permissible "in the narrow circumstance where such a severe restriction is necessary to protect the children's best interest." *Id.* at 221 (analyzing order restricting mother's possession to supervised visitation at managing conservators' discretion and

37

concluding that Sections 153.006(c) and 153.193, when read together, allow this type of severe restriction).

Mother argues that the trial court abused its discretion by imposing these terms of possession and access, contending that the order limits her rights more than if the Department had sought to terminate her parental rights. However, Mother does not contend that the trial court lacked good cause to deviate from the standard possession order; she contends only that the trial court's order exceeds what is necessary to protect the children's best interest. *See* Tex. Fam. Code § 153.006(c). Thus, we examine whether the trial court abused its discretion by ordering "as agreed" visitation or if instead that restriction on visitation is necessary to protect the children's best interest.

As detailed above, Grandfather presented ample evidence that supports the trial court's conclusion that the "as agreed" restriction on Mother's possession and access is necessary to protect the children's best interest. On this record, where the trial court heard evidence from several mental-health experts, the guardian ad litem, and the children themselves about the impact of Mother's interactions with the children on the children's physical and emotional welfare, we cannot conclude that the court abused its discretion by crafting an order for restricted possession that balances the protection of the children's wellbeing with Mother's rights. The trial court's order provides for agreed periods of possession, and failing agreement, it provides a specific time for Mother to have possession of Sam and Zephyr, subject to their rights to opt out of scheduled visitation, and also subject to their requests that the visitation be supervised and to their therapists' ability to recommend supervised visitation. Thus, the trial court's final order did not effectively terminate Mother's parental rights, as Mother argues. Instead, the order restricted those rights in a manner that allows Mother to attempt to repair and

rebuild her relationship with the children while still protecting the children's best interest. *See In re J.J.R.S.*, 627 S.W.3d at 221-22 (explaining that severe access restrictions are option available to trial court under Family Code "to balance the rights of parents with the importance of protecting children").

We note that the trial court observed after interviewing the children that they had "all developed really high emotional intelligence, and reflectiveness, an insight on to what they need to be the healthiest version of themselves, which is tremendous." The court further observed that their therapists were "on point with each of their clients, which is a good sign," and that "therapy has been very helpful for them." The court explained that all of the children expressed a preference for having Grandfather make parenting decisions and also wanted to have some connection to Mother. The court stated that "[t]hey each have a different idea of about how and when that looks. But they all have a preference to be able to heal and build their relationship with their mother while their grandfather is making the primary decisions for them." The court's focus was on providing the children a path to "hav[ing] loving adults and all of the support that [the court] know[s] that they want from everyone in their family."

Mother did not demonstrate that the trial court lacked sufficient evidence to support the restrictions that it imposed, and we hold that the restrictions did not exceed what is necessary to protect the best interest of the children. The record demonstrates that "the trial court's paramount concern [was] what was in the *children's* best interest based on the evidence before the court." *Coburn*, 433 S.W.3d at 824 & n.15 (noting that we "defer to the trial court's judgment in matters involving factual resolutions and any credibility determinations that may have affected those resolutions").

39

### 2. Child support

The trial court ordered Mother to pay Grandfather child support of $1,418.00 per month and additional child support of $591.53 per month for the children's health, dental, and vision insurance. Mother contends that the trial court abused its discretion by ordering her to pay these amounts in child support, asserting that (1) the trial court failed to consider that Mother's financial ability has been reduced by this suit and that Grandfather receives money for the children's support from their trust funds that are part of Father's estate and (2) the trial court failed to hear Mother's motion to modify child support before trial and did not hold a child-support hearing during or after trial.

Parents have a legal duty to financially support their children, regardless of whether the children are in their possession. *See Office of the Att'y Gen. of Tex. v. Scholer*, 403 S.W.3d 859, 866 (Tex. 2013) (explaining that parent "must diligently satisfy" that duty). The trial court has discretion to set child support within the parameters provided by the child-support guidelines in the Texas Family Code. *Iliff*, 339 S.W.3d at 78; *see generally* Tex. Fam. Code §§ 154.121-.133. "A court's order of child support will not be disturbed on appeal unless the complaining party can show a clear abuse of discretion." *Worford*, 801 S.W.2d at 109.

As an initial matter, we observe that the trial court ordered Mother to pay below-guidelines child support. The trial court made a finding of fact that ordering Mother to pay child support equal to 24% of her net monthly resources (below the guideline amount of 30%) was warranted based on "the resources available to the obligor, and the other resources available to the children." In other words, the trial court expressly considered the factors that Mother complains that it ignored.

40

The record evidence supports the trial court's order. The financial statement submitted by Mother before trial stated that her gross income was $8,400 per month and net money received per month was $7,201. Although Mother had filed for bankruptcy, she did not submit evidence to the trial court demonstrating that she could not afford the ordered amount of child support.[18] In addition, while there was evidence before the trial court that the children have trust funds from Father's estate, the trustees were setting aside money in an escrow account to pay Father's child-support obligations until the SAPCR was resolved so that the payments would be made to the correct party.[19] The trustees were paying from the trust funds the children's

[18] Mother also argues that the trial court improperly refused to allow her to put the children on her own company's health insurance policy instead of paying premiums to Grandfather. In the initial temporary orders, the trial court ordered Mother to provide insurance for the children through her employer at a cost of $1,485 per month and noted that Grandfather was not required to submit to Mother any explanations of benefits when seeking reimbursement for unreimbursed expenses because he did not have access to those from the insurance company. In March 2022, the trial court ordered instead that Grandfather had insurance available through his employer at a cost of $591.53 and that Mother was ordered to pay that amount to reimburse him for the children's health insurance premiums. Mother filed a motion to modify child support about a month before the final trial asserting that she could obtain insurance for the children at no cost through her employer. Mother is a self-employed attorney. She does not provide a record citation demonstrating that she presented this issue to the trial court at the final trial. The trial court did not abuse its discretion by ordering her to pay the additional child support amount for health insurance premiums. *See* Tex. Fam. Code § 154.181(e) (defining "reasonable cost" of health insurance coverage as cost that does not exceed 9% of obligor's annual resources); *id.* § 154.182 ("The court shall consider the cost, accessibility, and quality of health insurance coverage available to the parties and shall give priority to health insurance coverage available through the employment of one of the parties if the coverage is available at a reasonable cost to the obligor.").

[19] The trial court heard testimony from the children's attorney ad litem, who was appointed in a case that was pending in probate court that had been filed soon after Grandfather was awarded custody of the children in the temporary orders. The attorney ad litem informed the court that the probate-court suit was a declaratory-judgment action brought by the trustees of the children's trusts to resolve technical questions about the trusts' obligations to pay child support once child support was no longer due to Mother because she did not have custody of the children. The attorney ad litem testified that the trustees had also asked him to be a liaison with

41

private-school tuition and were reimbursing Grandfather for some of the children's medical expenses, including some of their therapy. The trustees, after consultation with the children by their attorney ad litem, had also agreed to pay up to $100,000 from each of their trusts in attorneys' fees expended by Grandfather. While Mother contends that Grandfather and the children's trusts are "quite affluent," she does not cite any evidence to support that assertion. Grandfather testified that with the varied costs of therapists, tutors, travel, and general room and board, including acquiring housing in Austin so that he and his wife could live in Austin with the children during the first year they had possession of the children, he had expended about a million dollars, which had drained his investment account. On this record, we cannot conclude that the trial court abused its discretion by not adjusting the child support owed by Mother further below the statutory guidelines.

As for Mother's procedural arguments that the trial court failed to hear Mother's motion to modify child support before trial and did not hold a child-support hearing during or after trial, Mother does not provide any evidence that she attempted to set the motion to modify for a hearing before the final trial. Grandfather argues that Mother was well aware that support would be decided at the final hearing, given that he included a request for child support in his initial pleadings in the SAPCR. Before the trial, both parties filed proposed dispositions that included requests for child support, and both parties presented some evidence related to support at trial. Mother did not request that the trial court hold a separate child-support hearing, and even if she had, the trial court would have been within its discretion to deny that request, given the lengthy discovery period and ample notice of the child-support issue before the trial. We

---

the children and talk to them about some expenditures from their trusts, including using some of the trust money to fund Grandfather's attorneys' fees for the SAPCR.

conclude that the trial court did not abuse its discretion by ordering that Mother pay child support in the amount of $1,418.00 per month and additional child support of $591.53 per month for the children's health, dental, and vision insurance.

### 3. Attorneys' fees

Mother contends that the trial court abused its discretion by awarding Grandfather attorneys' fees and conditional appellate attorneys' fees. The trial court found that Grandfather had incurred reasonable and necessary attorneys' fees in the suit in the amount of $515,253.07, "an amount calculated to be 60% of the total attorneys' fees requested by [Grandfather]" and ordered Mother to pay those fees to Grandfather's attorneys. The trial court also ordered conditional appellate attorneys' fees to be paid by Mother in the amount of $29,450 for an unsuccessful appeal to the court of appeals and up to $50,350 for an unsuccessful appeal to the Texas Supreme Court. Mother argues that we should reverse and remand the attorneys' fees award for a hearing in the trial court "with consideration for the parties' current finances and [Grandfather's] acceptance of funds from the children's trusts." She further argues that the conditional attorneys' fees award "is premature and imposes a chilling effect on [Mother's] appeal rights."

"An attorney's fees award in a suit affecting the parent-child relationship is discretionary with the trial court." *Lenz*, 79 S.W.3d at 21 (citing Tex. Fam. Code § 106.002). We review the trial court's award of attorneys' fees in a SAPCR for an abuse of discretion. *In re R.E.S.*, 482 S.W.3d 584, 586 (Tex. App.—San Antonio 2015, no pet.).

The parties submitted evidence of attorneys' fees by written submission after trial. Although Mother complains that the trial court's award of attorneys' fees does not properly

account for her financial status or the contribution authorized from the children's trusts by the trustees in consultation with the children, it is apparent that the trial court took both these factors into account in its consideration of the case. As noted above, both factors were cited as reasons for reducing the child-support award, and the trial court similarly adjusted the attorneys' fees award down to 60% of Grandfather's requested fees of $858,755.12.

Also, similarly to the child-support award, nothing in the record compels a further downward adjustment of the fees award. For example, while there is evidence that the trustees (in consultation with the children) had approved $100,000 from each of the children's trusts (for a total of $300,000) to help pay for the lawsuit, that amount is far less than the total fees reasonably and necessarily incurred by Grandfather. And although Mother had filed for bankruptcy, the evidence at trial showed that she still had significant monthly income as an attorney. The trial court acted well within its discretion based on the record before it.

Mother does not complain about the sufficiency of the evidence supporting the amount of the fees award. Grandfather proved up his attorneys' fees request with detailed billing records and a declaration from counsel proving up all the factors that courts consider when deciding whether attorneys' fees were reasonable and necessary. *See, e.g.*, *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 497-503 (Tex. 2019) (setting forth evidence required to calculate reasonable and necessary attorneys' fees in fee-shifting situation). Grandfather's counsel's declaration also proved up the reasonableness and necessity of conditional appellate attorneys' fees. *See Keith v. Keith*, 221 S.W.3d 156, 169, 171 (Tex. App.—Houston [1st Dist.] 2006, no pet.) ("The trial court's award of attorney's fees may include appellate attorney's fees," so long as those fees are shown to be reasonable and necessary and are conditioned upon unsuccessful appeal.).

In addition, Grandfather argues that other factors support the trial court's award of attorneys' fees. He was the prevailing party in the suit on virtually every point. *See In re R.E.S.*, 482 S.W.3d at 586-87 (noting success on the merits is a relevant but not decisive factor). Grandfather also suggests that we should not discourage relatives from intervening when children are in an abusive home environment by requiring them to shoulder the financial burden of the litigation in addition to the costs related to caring for the children. Furthermore, Grandfather contends that Mother increased the cost of litigation with her litigation tactics. Mother was sanctioned for discovery abuse, and Grandfather was forced to file four motions to compel, all of which he won. Grandfather also asserts, and Mother does not dispute, that Mother repeatedly challenged temporary orders and filed numerous motions that increased the cost of litigation. Additionally, Mother requested a ten-day jury trial and then waived her right to a jury two business days before trial began—when preparation was all but complete—which caused Grandfather substantial extra expenses (including a jury consultant and preparation of a jury charge, jury instructions, demonstratives, and the like). We agree that all these reasons further support the trial court's discretionary award of attorneys' fees.

We hold that the trial court had sufficient evidence before it to support its award of attorneys' fees, and it did not abuse its discretion by awarding Grandfather 60% of his total attorneys' fees and conditional appellate attorneys' fees.

We overrule Mother's third issue.

C.      **Trial court's order related to Mother's mental-health testing and diagnoses**

In her fourth issue, Mother challenges a portion of the trial court's final order that she asserts ordered her to undergo autism testing and that the results be shared with the children.

Mother contends that the trial court lacked statutory authority to make this order, that it reflected bias against her by the trial judge, that it violated the Americans with Disabilities Act (ADA), and that it violated the Health Insurance Portability and Accountability Act (HIPAA).

As an initial matter, we disagree with Mother's characterization of the trial court's order. The trial court did not require Mother to be tested for autism. Instead, it ordered that the children receive education and therapeutic support about Mother's mental-health issues, and its order indicated that the content of that education would depend on whether she had testing done to confirm her expert's recent diagnosis of autism.[20] If Mother was unable or unwilling to obtain confirmation of that diagnosis within 180 days of the order, the court's order required "that the children receive developmentally appropriate education on the Diagnostic Impressions of [the court-appointed forensic psychologist] as reported in [the psychologist's] Forensic Psychological Evaluation of [Mother], dated May 15, 2023, and receive therapeutic support related to their relationship with [Mother] incorporating the education of the diagnosis of [the psychologist]." The Family Code vests the trial court with the power to enter an order like this. "The trial court retains broad discretion in crafting the rights and duties of each conservator to promote the children's best interests." *Coburn*, 433 S.W.3d at 828. Texas courts regularly order therapy for both parents and children in SAPCR cases. *See, e.g.*, *Forbes v. Forbes*, No. 03-15-00130-CV, 2016 WL 612175, at *5 (Tex. App.—Austin Feb. 12, 2016, no pet.) (mem. op.) (affirming trial

---

[20] The court-appointed psychologist disagreed with Mother's expert's autism diagnosis but recommended more testing if autism was in question. Although Mother's expert disagreed that more testing was necessary, she agreed that one of the two tests suggested by the court-appointed psychologist was the test that is most used. The trial court, as the factfinder in the bench trial, did not abuse its discretion by ordering more testing to confirm Mother's diagnosis so that the children could receive appropriate education and therapeutic support.

court's order requiring parent to show that he was regularly seeking mental-health treatment as condition of step-up possession order).

Mother did not plead or argue in the trial court that the order violated her rights under either the ADA or HIPAA, and she does not adequately explain those arguments on appeal. Mother asserts that "the trial court's order does not take into account her rights as a parent with autism, and [it] assumes that she is incapable of parenting." Mother does not explain further how the trial court's order unlawfully discriminates against her. The only legal authority that she provides in support of this argument is a case brought by the Department seeking to terminate a parent's rights. *In re B.L.M.*, 114 S.W.3d 641, 649 (Tex. App.—Fort Worth 2003, no pet.). In that case, the parent complained that the Department violated the ADA by failing to accommodate his mental deficiencies and provide him with services designed for his special needs as a schizophrenic. *Id.* The court determined that the parent waived his complaint, which was in the nature of an affirmative defense. *Id.* (noting that father neither pleaded nor proved his affirmative defense and did not offer any evidence at trial concerning what accommodations or special services he contended should have been provided to him). Similarly to the father in *In re B.L.M.*, Mother did not offer evidence at trial of accommodations that the trial court should have made for her special needs. Nor did she explain on appeal how the trial court's order discriminates against her.

As for her HIPAA argument, Mother contends that the trial court's order that the children should be educated about her mental-health status violates her privacy rights under HIPAA. She points the Court to her opposition to the proposed judgment filed in the trial court where she argued only that "any dissemination of [Mother's] medical records to the children would be wildly inappropriate, and a violation of [Mother's] privacy rights under HIPAA." She

47

provided no legal authority either in the trial court or in this Court to support this argument. Mother herself introduced her expert's autism diagnosis into the record. In addition, we note that the trial court did not order that Mother's medical records should be disseminated to the children.

Instead, the trial court's order sought to promote the children's best interests by educating them in a therapeutic setting on Mother's mental-health issues, which the evidence shows had an impact on them. We conclude that the trial court did not abuse its discretion by requiring that the children receive developmentally appropriate education about Mother's mental-health issues. We overrule Mother's fourth issue.

## CONCLUSION

Having overruled Mother's issues, we affirm the trial court's final SAPCR order.

_____

Gisela D. Triana, Justice

Before Chief Justice Byrne, Justices Triana and Kelly

Affirmed

Filed: January 30, 2026